Argued and submitted September 5, 2008; in Case Number A130703, OAR 340-045-0033(11)(d) held invalid; Case Number A129732 dismissed as moot December 23, 2009

NORTHWEST ENVIRONMENTAL DEFENSE CENTER,
an Oregon nonprofit corporation;
Siskiyou Project,
an Oregon nonprofit corporation;
and Hells Canyon Preservation Council,
an Oregon nonprofit corporation,
*Petitioners,*

*v.*

ENVIRONMENTAL QUALITY COMMISSION;
Department of Environmental Quality;
Stephanie Hallock,
in her official capacity as
Director of the Department of Environmental Quality;
Eastern Oregon Mining Association,
an incorporated association;
Guy Michael;
and Robert Heitmanek,
*Respondents.*

A129732 (Control)

EASTERN OREGON MINING ASSOCIATION,
an incorporated association;
Guy Michael;
and Robert Heitmanek,
*Petitioners,*

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY;
Stephanie Hallock, in her capacity as
Director of the Department of Environmental Quality;
and Lauri Aunan, in her capacity as
Administrator of the Department of Environmental Quality,
*Respondents.*

A130703

223 P3d 1071

Allison LaPlante argued the cause for petitioners Northwest Environmental Defense Center, Siskiyou Project, and Hells Canyon Preservation Council. With her on the briefs were Melissa Powers and Pacific Environmental Advocacy Center, and Peter M. K. Frost and Western Environmental Law Center.

James L. Buchal argued the cause for petitioners Eastern Oregon Mining Association, Guy Michael, and Robert Heitmanek. With him on the briefs was Murphy & Buchal LLP.

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for respondents Department of Environmental Quality, Environmental Quality Commission, Stephanie Hallock, and Lauri Aunan. With her on the brief

were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

This case involves dueling challenges under ORS 183.400 to a rule adopted by the Oregon Environmental Quality Commission (EQC) relating to small suction dredge mining operations. The rule at issue is actually a general discharge permit, known as the "700-PM permit," which places certain conditions on the operation of small suction dredges in the waters of the state; miners can then seek authorization under the 700-PM permit to operate their suction dredges in accordance with the permit conditions. OAR 340-045-0033(11)(d). On one side of the debate, an environmental interest group, Northwest Environmental Defense Center (NEDC), contends that the 700-PM permit is invalid because EQC failed to follow certain procedural requirements and because the permit violates aspects of the Clean Water Act, 33 USC §§ 1251-1376,[1] and Oregon water pollution control laws. On the other side, a mining interest group, Eastern Oregon Mining Association (EOMA), contends that the permit exceeds EQC's authority because the discharge at issue is the discharge of "dredged material," a matter within the exclusive authority of the Army Corps of Engineers under the Clean Water Act. EQC, meanwhile, contends that it had statutory authority to adopt the rule, followed all applicable procedural requirements, and satisfied the requisites of the Clean Water Act and Oregon law. We conclude that the permit exceeded EQC's statutory authority. For that reason, we hold the permit invalid.

As noted above, the rule before us is a general permit. The permit was adopted by EQC in 2005 as part of its implementation of the federal Clean Water Act—more specifically, as part of the National Pollution Discharge Elimination System (NPDES) permit program. *See* ORS 468B.035 (providing for state implementation of the Clean Water Act). In general, under the Clean Water Act, the discharge of any pollutant into the navigable waters of the United States is unlawful. 33 USC § 1311(a). The critical exception is that the discharge of pollutants is allowed under certain permitting schemes, one of which is the NPDES permit program. *See* 33

---

[1] We refer to the Federal Water Pollution Control Act, as amended, by its more common moniker, the Clean Water Act.

USC § 1342. The Clean Water Act contemplates that states be delegated authority to issue permits under the NPDES system, and Oregon has assumed that responsibility. ORS 468B.035; OAR 340-045-0005 to 340-045-0080.

The permit at issue in this case—the 700-PM permit—is an NPDES permit, which EQC adopted pursuant to ORS 468B.035.[2] The permit regulates a practice known as small suction dredge mining. Small suction dredge mining

> "involves using a high pressure pump driven by a gasoline powered motor to create suction through a flexible intake hose with a fixed inside diameter. There are variable sized dredges ranging from 2"-12" in diameter. While operating, streambed sediments and water are vacuumed through the intake nozzle and passed over a sluice tray mounted on floats. Dense particles, including gold, are trapped in the sluice box tray. The remainder of lighter entrained material is discharged back into the stream as tailings. Those tailings accumulate to form piles after hours of operation. Rocks and boulders too large to pass through the intake hose are often moved by hand."[3]

Over the years, miners and environmental groups have debated the individual and cumulative environmental effects of the practice, particularly as a result of the wastewater and tailings that are discharged back into the stream. In April 1997, DEQ began regulating small suction dredge mining under a general permit known as the 700-J permit, the predecessor to the permit at issue in this case. The 700-J permit was itself the subject of litigation and expired by its terms in March 2002. In 2004, DEQ notified miners, environmentalists, and others that it intended to revise the 700-J

---

[2] Under ORS 468B.035, rulemaking authority is vested in the Environmental Quality Commission. The permit in this case was adopted by EQC and was issued by the Department of Environmental Quality (DEQ).

[3] We take that explanation of suction dredge mining from a document in the record entitled "Summary of 1998 Observations of Recreational and Small Scale Placer Mining in Oregon's Designated Essential Indigenous Anadromous Salmonid Streams and State Scenic Waterways," prepared by the Division of State Lands. That definition appears to comport with the parties' understanding of the term and its common meaning. *See, e.g., Hells Canyon Preservation Council v. Haines*, No CV 05-1057-PK, 2006 WL 2252554 at *2 (D Or Aug 4, 2006) ("Suction dredge mining vacuums silt, sand and small gravels from the streambed, passes the gravel and other materials through a dredge machine in order to filter out the gold, and then discharges gravel, sand and silt back into the river.").

permit. EOMA and NEDC participated in a public comment process and hearings concerning the revised permit, which was eventually adopted by EQC as the 700-PM permit.

Permit 700-PM "covers suction dredges not to exceed 30 horsepower with an inside diameter suction hose no greater than 6 inches that are used for recovering precious metals or minerals from stream bottom sediments." It provides a number of "discharge limitations," including the requirement that "[n]o wastes may be discharged and no conductivities may be conducted that will violate Water Quality Standards as adopted in OAR Chapter 340, Division 41." The water quality standards in division 41 include "turbidity" standards. OAR 340-041-0036. "Turbidity," in that context, refers to cloudiness of water caused by suspended particles, sometimes measured by "nephelometric turbidity units."[4]

The 700-PM permit regulates turbidity in terms of "background turbidity" and "visible turbidity":

"1.  *Background Turbidity* means turbidity that represents the ambient, undisturbed turbidity as measured or observed at least 10 feet upstream from the suction dredge operation at the time dredging occurs.

"2.  *Visible Turbidity* means turbidity that is distinctly visible when compared to background turbidity."

The permit then provides certain "discharge limitations" with respect to turbidity: "Suction dredges with suction hoses that have an inside diameter of 4 inches or greater must not create visible turbidity beyond 300 feet downstream from a working dredge." However, a "single operating suction dredge equipped with a suction hose with an inside diameter less than 4 inches has no turbidity discharge limitation." Similarly, the permit requires operators of larger suction

_____

[4] *See* ORS 468B.005 (defining "pollution" or "water pollution" to include "such alteration of the physical, chemical or biological properties of any waters of the state, including change in temperature, taste, color, *turbidity*, silt or odor of the waters") (emphasis added); OAR 340-041-0036 (describing "turbidity" in terms of nephelometric turbidity units); *see also* OAR 340-071-0100(172) (In the context of wastewater treatment regulations, " '[t]urbidity' means the optical condition of waters caused by suspended or dissolved particles or colloids that scatter and absorb light rays instead of transmitting light in straight lines through the water column. Turbidity may be expressed as nephelometric turbidity units (NTU) measured with a calibrated turbidimeter.").

dredges (those with suction hoses that have an inside diameter of 4 inches or greater) to visually monitor on a daily basis to determine whether turbidity is visible beyond 300 feet downstream, whereas "[s]uction dredges with suction hoses that have an inside diameter less than 4 inches do not have to monitor for turbidity."

Neither NEDC nor EOMA was satisfied with permit 700-PM, and both groups filed petitions for judicial review in which they assert challenges to the validity of the permit under ORS 183.400. NEDC, for its part, contends that EQC did not comply with applicable rulemaking requirements—namely, that the final permit was so different from the proposed permit in the rulemaking notice that NEDC had no meaningful opportunity to comment on it. As to the substance of the permit, NEDC contends that the permit does not comport with the requirements of the Clean Water Act and Oregon water pollution laws. EOMA, meanwhile, submits that the rule exceeds the agency's statutory authority because it purports to regulate the "discharge of dredged material," which EOMA contends is a matter that is regulated by the Army Corps of Engineers and *not* by the NPDES permitting program; thus, EOMA argues, the rule purports to regulate subject matter that is beyond the scope of the federal permitting scheme that EQC is authorized to implement.

Because it is dispositive, we begin with EOMA's contention that the 700-PM permit exceeds the agency's authority because it purports to regulate the "discharge of dredged material." *See* ORS 183.400(4)(b) (stating that this court "shall declare the rule invalid only if [we] find[ ] that the rule * * * [e]xceeds the statutory authority of the agency").[5] Our review of a facial rule challenge of that kind is limited to the rule itself and the statutory provisions authorizing the rule. ORS 183.400(3); *Wolf v. Oregon Lottery Commission*, 344 Or 345, 182 P3d 180 (2008). In the ordinary rule challenge under 183.400(4)(b), little more need be said about our standard of review. The permit at issue here, however, is authorized by state law that, in turn, implements the federal Clean Water

---

[5] Because we hold the rule invalid based on EOMA's petition (A130703), we need not reach the issues in NEDC's petition (A129732).

Act. EOMA's challenge to the permit is that it exceeds EQC's authority because, under the Clean Water Act, which EQC is implementing, small suction dredge mining is regulated by the Army Corps of Engineers rather than through the NPDES permit system. Thus, at its heart, EOMA's challenge to the permit presents a question regarding the proper construction of the Clean Water Act—an issue of federal law.

■■ In interpreting federal statutes, we follow the methodology that federal courts have prescribed, which generally means examining the text, context, and legislative history of the statute. *Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 378, 213 P3d 1164 (2009). But there is "an additional methodological wrinkle" when "a federal agency has been charged by Congress with implementing a federal statute[.]" *Id.* In that circumstance, courts "should defer to that agency's interpretation of the statute, treating that interpretation as controlling as long as it is reasonable." *Id.* (citations omitted). "Although that sort of deference is foreign to the administrative law of this state, we are bound to apply it in our interpretation of federal statutes if the federal interpretive methodology so demands." *Id.* (footnote omitted).

To better frame EOMA's challenge, we begin with a brief overview of the state and federal regulatory background with respect to discharges into Oregon's waters. In ORS chapter 468B, the legislature articulated a general policy of the state to, among other things, "provide that no waste be discharged into any waters of this state without first receiving the necessary treatment or other corrective action to protect the legitimate beneficial uses of such waters"; "provide for the prevention, abatement and control of new or existing water pollution"; and "cooperate with other agencies of the state, agencies of other states and the federal government in carrying out these objectives." ORS 468B.015(3) - (5). Likewise, ORS 468B.035 specifically provides for the implementation of the federal Clean Water Act by EQC:

> "The Environmental Quality Commission may perform or cause to be performed any acts necessary to be performed by the state to implement within the jurisdiction of the state the provisions of the [Clean Water Act] and federal

regulations or guidelines issued pursuant to the Act. The commission may adopt, modify or repeal rules, pursuant to ORS chapter 183, for the administration and implementation of this subsection."

ORS 468B.035(1).[6]

The Clean Water Act, in turn, prohibits the "discharge of any pollutant by any person" unless the discharge is otherwise permitted under the Act. 33 USC § 1311(a) ("Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."). The term "pollutant" means *"dredged spoil*, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, *rock*, *sand*, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 USC § 1362(6) (emphasis added).

Section 402 of the Clean Water Act sets forth one of the circumstances in which the discharge of a pollutant is permitted. That section provides, in part:

"Except as provided in sections 1328 and 1344 of this title, the Administrator [of the Environmental Protection Agency (EPA)] may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter."

33 USC § 1342(a)(1). Section 402 also allows states to administer their own permit programs for discharges into navigable waters, to be approved by the Administrator of the EPA.

---

[6] *See also* ORS 468B.048 (authorizing EQC to establish, by rule, "standards of quality and purity for the waters of the state in accordance with the public policy set forth in ORS 468B.015"); ORS 468B.050 (prohibiting the discharge of waste into the waters of the state without a permit and providing that DEQ may issue such permits).

33 USC § 1342(b). Permits issued by the EPA or by states that have assumed that responsibility under section 402 of the Clean Water Act are commonly referred to as NPDES permits.

■      This is where the waters get muddy, so to speak. The first sentence of section 402 carves out an exception to the EPA's permitting authority—"[e]xcept as provided in sections 1328 and *1344 of this title*[.]" (Emphasis added.) Section 1344 of Title 33, more commonly known as section 404 of the Clean Water Act, authorizes an entirely different permitting scheme—a scheme implemented not by the EPA or states under section 402 but instead by the Army Corps of Engineers (the Corps). Section 404 provides, in part: "The Secretary [of the Army, acting through the Chief of Engineers,] may issue permits, after notice and opportunity for public hearings *for the discharge of dredged or fill material* into the navigable waters at specified disposal sites." 33 USC § 1344(a) (emphasis added).[7] Thus, discharges of "pollutants" (which include dredged spoil, sand, and rock) are regulated by the EPA, but a subset of pollutant discharges—discharges of "dredged or fill material into the navigable waters at specified disposal sites"—are instead regulated by the Corps.

Recently, the United States Supreme Court explained that the two schemes are indeed mutually exclusive. *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council,* ___ US ___ , 129 S Ct 2458, 174 L Ed 2d 193 (2009). In *Coeur Alaska, Inc.,* conservation groups filed an action

---

[7] To further complicate matters, the Department of State Lands, rather than EQC or DEQ, appears to have statutory authority to assume responsibility for implementing section 404 of the Clean Water Act at the state level. *See* ORS 196.795(1) ("The Department of State Lands shall continue to pursue methods to streamline the process for administering permits for the removal of material from the bed or banks of any waters of this state or for filling the waters of this state, reducing paperwork, eliminating duplication, increasing certainty and timeliness and enhancing resource protection. The efforts of the Department of State Lands shall include but need not be limited to applying to the United States Army Corps of Engineers for a state program general permit as authorized in federal regulations implementing section 404 of the [Clean Water Act], and section 10 of the Rivers and Harbors Act of 1899, as amended. *In conjunction with these activities, the Department of State Lands may continue to investigate the possibility of assuming the federal regulatory program under [section 404 of the Clean Water Act].*" (Emphasis added.)).

challenging the lawfulness of a permit issued by the Corps to the petitioner, Coeur Alaska, Inc. (Coeur Alaska), for the discharge of mining waste into Lower Slate Lake. The conservation groups contended, among other things, that the Corps did not have authority to issue the permit because the discharge of mining waste ("slurry") fell within the regulatory authority of the EPA as a pollutant under section 402 of the Clean Water Act. In rejecting that contention, the Court explained:

"Section 402 gives the EPA authority to issue 'permit[s] for the discharge of any pollutant,' with one important exception: The EPA may not issue permits for fill material [or dredged material] that fall under the Corps' § 404 permitting authority. Section 402(a) states:

" '*Except as provided in * * * [Clean Water Act § 404, 33 USC § 1344]*, the Administrator may * * * issue a permit for the discharge of any pollutant * * *.'

"Section 402 thus forbids the EPA from exercising permitting authority that is 'provided [to the Corps] in' § 404.

"* * * * *

"The Act is best understood to provide that if the Corps has authority to issue a permit for a discharge under § 404, then the EPA lacks authority to do so under § 402."

____ US at ____ , 129 S Ct at 2467 (emphasis in original).

EOMA's challenge in this case presents an issue similar to the one presented in *Coeur Alaska, Inc.*: Which agency—the Corps or the EPA—has authority under the Clean Water Act to issue a permit for waste discharges from small suction dredges? If the EPA is the proper regulatory authority for those in-stream discharges, then EQC had statutory authority to adopt the 700-PM permit as part of its implementation of the NPDES permit scheme. However, if those discharges are properly regulated by the Corps under section 404 of the Clean Water Act as "the discharge of dredged or fill material," then EQC exceeded its statutory authority to regulate the discharges under the NPDES program.[8]

---

[8] The state agencies (DEQ and EQC) do not argue that the permit was adopted under any authority other than their authority to implement the Clean Water Act.

■ Initially, we observe that the 700-PM permit does not specifically identify the "discharge" that is being regulated; rather, it regulates the discharge of all wastes that violate water quality standards. For the reasons that follow, we conclude that the permit's lack of specificity in that regard causes it to exceed EQC's statutory authority.

The question posed by the parties in this case is whether the discharges from small suction dredges constitute "the discharge of dredged or fill material"—more specifically, whether they constitute the discharge of "dredged material"—under section 404 of the Clean Water Act. 33 USC § 1344(a).[9] The term "dredged material" is not defined in section 404. The ordinary meaning of "dredged" material, in context, is material that has been "scoop[ed] or [dug] * * * from the bed or body of water," or material "scoop[ed] up or remov[ed] * * * (as in excavating or deepening stream or harbor channels, building levees, or digging ditches) usu. by a series of buckets on an endless chain, a pump or suction tube, or a single bucket or grab at the end of an arm * * *." *Webster's Third New Int'l Dictionary* 688 (unabridged ed 2002). In the case of suction dredges, including the small suction dredges that are regulated by the 700-PM permit, sediment and water are sucked up by a machine, and wastewater and mining tailings are then discharged or added back to the water downstream.

On its face, section 404 does not address whether discharges such as those from small suction dredges constitute the "discharge of dredged material." On the one hand, Congress might have intended any resuspension of dredged material, including spoils and/or processed wastewater, to come within the regulatory authority of the Corps; on the other hand, Congress might have understood "dredged material" to be limited to *unprocessed* dredged material, as opposed to mining tailings or wastewater effluent containing resuspended sediment. Because Congress has not " 'directly spoken' " to that " ' precise question, ' " section 404 alone does not resolve the issue. *Coeur Alaska, Inc.*, ___ US at ___ , 129

---

[9] Whereas the slurry in *Coeur Alaska, Inc.*, qualified as "fill material" under section 404 of the Clean Water Act, the dispute in this case focuses on whether the discharge is "dredged material," the other discharge regulated by the Corps.

S Ct at 2469 (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837, 842, 104 S Ct 2778, 81 L Ed 2d 694 (1984)).

Given the ambiguity in the Clean Water Act, we assume that Congress intended for the meaning of the term "discharge of dredged material" to be resolved by the Corps and the EPA, the agencies charged with implementing sections 402 and 404. Accordingly, we turn to what is, frankly, a rather tortured regulatory history regarding the meaning of the term "discharge of dredged material."

The term "dredged material" is defined, somewhat tautologically, in both Corps and EPA regulations: "The term *dredged material* means material that is excavated or dredged from waters of the United States." 33 CFR § 323.2(c); *see* 40 CFR § 232.2 (similarly defining dredged material). Moreover, at the time that the 700-PM permit was adopted, Corps and EPA regulations contained the following expanded explanation of what it means to discharge dredged material:

"(1)   Except as provided below in paragraph (d)(3), the term *discharge of dredged material* means *any addition of dredged material into, including redeposit of dredged material other than incidental fallback within,* the waters of the United States. The term includes, but is not limited to, the following:

"(i)   The addition of dredged material to a specified discharge site located in waters of the United States;

"(ii)   The runoff or overflow from a contained land or water disposal area; and

"(iii)   *Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.*

"(2)(i)   The Corps and EPA regard the use of mechanized earth-moving equipment to conduct landclearing, ditching, channelization, *in-stream mining* or other earth-moving activity in waters of the United States as resulting in a discharge of dredged material unless project-specific evidence shows that the activity results in only incidental

fallback. This paragraph (i) does not and is not intended to shift the burden in any administrative or judicial proceeding under the [Clean Water Act].

"(ii) *Incidental fallback* is the redeposit of small volumes of dredged material that is incidental to excavation activity in waters of the United States when such material falls back to substantially the same place as the initial removal. Examples of incidental fallback include soil that is disturbed when dirt is shoveled and the back-spill that comes off a bucket when such small volume of soil or dirt falls into substantially the same place from which it was initially removed.

"(3) The term *discharge of dredged material* does not include the following:

"(i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable State section 404 program.

"(ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chainsawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.

"(iii) Incidental fallback."

33 CFR § 323.2(d)(1) - (3) (2001) (emphasis added); 40 CFR § 232.2(1) - (3) (2001) (similarly defining discharge of dredged material).

That regulatory definition of "discharge of dredged material" was the product of numerous revisions, predominantly in response to legal challenges over its scope. In 1993, the EPA and the Corps issued regulations known as the "*Tulloch* Rule," which defined the term "discharge of dredged material" as including "any addition, including any redeposit, of dredged material, including excavated material, into

waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation." Clean Water Act Regulatory Programs, 58 Fed Reg 45008 (Aug 25, 1993). At the time that they promulgated that change, the EPA and the Corps explained that

> "[t]he Corps and EPA expect that the net effect of this rule will be that most projects involving mechanized landclearing, ditching, channelization, *mining*, or other excavation activity in waters of the U.S. will require authorization under CWA Section 404. Although this new rule will regulate a number of projects that previously might have escaped Section 404 regulation, it is important to realize that *the Corps has been regulating many projects involving mechanized landclearing, ditching, channelization, mining, or other excavation in waters of the U.S. for years because those projects frequently involved substantial discharges of dredged or fill material into waters of the U.S. For example, * * * many channelization, mining, and other excavation activities in U.S. waters have been regulated under Section 404 over the years, because they involved substantial discharges through disposal or stockpiling of the excavated material in waters of the U.S., or 'sloppy' excavation practices, or other substantial discharges.* * * *

> "Nevertheless, this final rule does represent both a clarification of agency guidance and a change of agency practice regarding a sub-class of excavation-type activities in waters of the U.S.: *i.e., those that would take place with relatively small-volume, 'incidental' discharges of dredged material that unavoidably accompany such excavation operations.* Until the Corps and EPA undertook this present rulemaking, neither agency had ever promulgated written guidance explicitly and specifically addressing the question whether CWA Section 404 could or should regulate ditching, channelization, *mining*, or comparable excavation activities in waters of the U.S. based solely on their incidental discharges of dredged material. However, *most Corps districts normally followed the practice of not regulating such activities so long as their discharges of dredged material were limited to small-volume, 'incidental' discharges.*"

58 Fed Reg at 45013 (emphasis added).

In response, the American Mining Congress and several other trade associations challenged the revised definition of the term "discharge of dredged material" on the ground that it impermissibly regulated "incidental fallback" during the dredging process that did not constitute a discharge of dredge. In 1997, the United States Court of Appeals for the District of Columbia Circuit held that the regulation indeed exceeded the Corps' authority under section 404 because it impermissibly regulated "any" redeposit, which would include "incidental fallback." *National Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F3d 1399, 1403-04 (DC Cir 1998). According to the court, "incidental fallback"—such as when " 'a bucket used to excavate material from the bottom of a river, stream, or wetland is raised and soils or sediments fall from the bucket back into the water' "—does not constitute the "addition" of a pollutant under the Clean Water Act and was therefore beyond the Corps' authority. *Id.* at 1403 (quoting the Corps' briefing).

In 1999, the EPA and the Corps responded to that decision by revising the definition to remove the modifier "any" and to expressly state that "incidental fallback" is *not* a discharge of dredged material. Revisions to the Clean Water Act Regulatory Definition of "Discharge of Dredged Material," 64 Fed Reg 25120 (May 10, 1999). In 2001, the EPA and Corps again revised the definition, this time adding to the definition of "incidental fallback." Under the revised rule, known as *"Tulloch II,"* the definition of "discharge of dredged material" included two paragraphs intended to clarify the Corps and the EPA's understanding of "incidental fallback":

"(i)   The Corps and EPA regard the use of mechanized earth-moving equipment to conduct landclearing, ditching, channelization, *in-stream mining* or other earth-moving activity in waters of the United States as resulting in a discharge of dredged material unless project-specific evidence shows that the activity results in only incidental fallback. This paragraph (i) does not and is not intended to shift the burden in any administrative or judicial proceeding under the [Clean Water Act].

"(ii)   *Incidental fallback* is the redeposit of small volumes of dredged materials that is incidental to excavation activity in waters of the United States when such material

falls back to substantially the same place as the initial removal. Examples of incidental fallback include soil that is disturbed when dirt is shoveled and the back-spill that comes off a bucket when such small volume of soil or dirt falls into substantially the same place from which it was initially removed."

33 CFR § 323.2(d)(2) (2001) (emphasis added); *see* 40 CFR § 232.2(2) (2001) (providing similar explanation); Further Revisions to the Clean Water Act Regulatory Definition of "Discharge of Dredged Material," 66 Fed Reg 4550 (Jan 17, 2001).

So, as of January 2001, the Corps and the EPA had specifically identified "in-stream mining" as an activity that was "regarded" by the Corps as involving a discharge of dredged material. Moreover, the summary of agency action that accompanied the 2001 rule changes specifically addressed the agencies' views on "in-stream mining"—and, in particular, "suction dredging." In response to comments that the regulation was overly inclusive, the agencies explained:

"We do recognize, however, that some excavation activities by using specialized techniques or precautions may be conducted in such a manner that no discharge of dredged material in fact occurs. Today's rule specifically provides for consideration of project-specific information as to whether only incidental fallback results in determining jurisdiction under section 404. *For example, we acknowledge that some suction dredging operations can be conducted in such a manner that if the excavated material is pumped to an upland location or other container outside waters of the U.S. and the mechanized removal activity takes place without re-suspending and relocating sediment downstream, then such operations generally would not be regulated.*"

66 Fed Reg at 4554 (emphasis added). One inference that could be drawn from that description is that suction dredging operations are regulated under section 404 if the "excavated material" is *not* pumped to land or an out-of-water container and where the removal activity *does* resuspend or relocate sediment downstream.

The agencies similarly responded to "several comments regarding mining practices," one of which asserted

that, "under the proposed definition, most placer mines, suction dredges, and exploration trenches would be required to obtain an individual 404 permit." 66 Fed Reg at 4562. The agencies referred back to their earlier discussion of suction dredging:

> "As discussed in section II C of today's preamble, the final rule does not establish a rebuttable presumption, and provides for consideration of project-specific information to determine if a discharge results. We thus do not believe that today's rule has the effect of 'per se' precluding or regulating all activities conducted with mining equipment in waters of the U.S. *For example, as noted in section III A 1 a of today's preamble, some suction dredging can be conducted in such a way as not to produce a regulable discharge.*"

*Id.* (emphasis added).

The *Tulloch II* rule was in effect when the 700-PM permit was promulgated and is evidence that the Corps and the EPA understood that "in-stream mining"—and, in particular, suction dredging—is a type of activity that can be regulated by the Corps under section 404.[10] Yet the rule and the agencies' discussion of the rule are not clear as to what "discharge" would be regulated by the Corps—processed wastewater containing suspended solids or something else. The rulemaking commentary, though, suggests that the downstream discharge of suspended dredged material constitutes the "discharge of dredge" within the meaning of the statute, thereby bringing that discharge within the exclusive regulatory authority of the Corps.

On various other occasions over the past two and one-half decades, however, the Corps and EPA have suggested that wastewater discharges from placer mining,[11] and

---

[10] *Tulloch II* was eventually invalidated by a district court because of the way that the rule used volume to determine "incidental fallback." *National Ass'n Homebuilders v. U.S. Army Corps of Engineers*, No. 01-0274, 2007 WL 259944 (D DC Jan 30, 2007). In response, the Corps and EPA issued amended regulations that deleted material added by *Tulloch II*, but we are not aware of anything in the text or history of those amendments that suggests that the Corps or EPA intended to back away from its understanding that the redeposit of suction dredge, other than "incidental fallback," into navigable waters is a discharge of dredged material. Revisions to the Clean Water Act Regulatory Definition of "Discharge of Dredged Material," 73 Fed Reg 79641 (Dec 30, 2008).

[11] Suction dredging is one type of placer mining. For a discussion of placer mining, *see* 232 Or App at 639.

possibly discharges of dredged spoil itself, are regulated by the EPA and not the Corps. In 1986, the Corps and the EPA entered into a Memorandum of Agreement with respect to discharges of solid and semi-solid waste materials. Memorandum of Agreement on Solid Waste, 51 Fed Reg 8871 (Mar 14, 1986). That memorandum was intended "to resolve a difference (since 1980) between Army and EPA over the appropriate CWA program for regulating certain discharges of solid wastes into waters of the United States." *Id.* at 8871. Although the memorandum primarily concerned "fill material," it also discussed the discharge of dredged material:

> "B. 5 * * * [A] pollutant (*other than dredged material*) will normally be considered by EPA and the Corps to be subject to section 402 if it is a discharge in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogeneous nature normally associated with single industry wastes, and from a fixed conveyance, or if trucked, from a single site and set of known processes. *These materials include placer mining wastes*, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds."

*Id.* (emphasis added).

Following the Memorandum of Agreement, the Corps issued a Regulatory Guidance Letter that addressed the interplay between sections 402 and 404 with respect to placer mining. U.S. Army Corps of Engineers, Regulatory Guidance Letter 88-10 (July 28, 1990). The guidance letter provided:

> "Paragraph B.5. in the Army's 23 Jan 86 Memorandum of Agreement (MDA) with EPA, concerning the regulation of solid waste discharges under the Clean Water Act, states that discharges that result from in-stream mining activities are subject to regulation under Section 402 and not under Section 404.

> "Dredged material is that material which is excavated from the waters of the United States. *However, if this material is subsequently processed to remove desired elements, its nature has been changed; it is no longer dredged material. The raw materials associated with placer mining operations are not being excavated simply to change their location as in a normal dredging operation, but rather to obtain materials*

*for processing, and the residue of this processing should be considered waste. Therefore, placer mining waste is no longer dredged material once it has been processed, and its discharge cannot be considered to be a 'discharge of dredged material' subject to regulation under Section 404."*

(Emphasis added.) By its terms, the guidance letter expired only half a year later, on December 31, 1990.[12] Nonetheless, the Corps had articulated the position that mining waste, presumably including wastewater and dredged spoil, were distinct from "dredged material." Consequently, as of 1990, the Corps appears to have taken the position that mining wastes from placer mining were subject to regulation by the EPA under section 402.

Meanwhile, and even before the two agencies negotiated the Memorandum of Agreement, the EPA had taken the position that wastewater discharges from placer mining operations were within its regulatory authority under section 402. In 1985, the EPA proposed effluent limitations for placer mining operations in Alaska, which included limitations on total suspended solids in mining wastewater. *See* Effluent Limitations Guidelines and New Source Performance Standards, 50 Fed Reg 47982 (Nov 20, 1985). Those regulations were challenged by placer miners, and by 1990 the litigation had wended its way to the Ninth Circuit. *Rybachek v. U.S. E.P.A.*, 904 F2d 1276 (9th Cir 1990).

In challenging the proposed effluent limitations, the Alaskan placer miners argued that the EPA had exceeded its authority in various ways. In addressing those challenges, the Ninth Circuit first identified the nature of the "discharge" at issue:

---

[12] In 2005, the Corps issued a later guidance letter that addressed the continuing viability of previous, expired guidance letters. U.S. Army Corps of Engineers, Regulatory Guidance Letter 05-06 (Dec 7, 2005). That 2005 letter included a list of those guidance letters that, although outdated, "continue to be generally applicable to the Corps Regulatory Program." *Id.* The 1990 guidance letter regarding placer mining was not listed among the letters that had continuing viability. *Id.* Nor, to our knowledge, has the Corps or EPA expressed any continued reliance on the Memorandum of Understanding, 51 Fed Reg 8871 (Mar 14, 1986), as it relates to this issue. Nonetheless, as discussed below, 232 Or App at 640-42, the letter and memorandum provide relevant historical context.

"Placer mining is one of the four basic methods of mining metal ores; it involves the mining of alluvial or glacial deposits of loose gravel, sand, soil, clay, or mud called 'placers.' These placers often contain particles of gold and other heavy minerals. Placer miners excavate the gold-bearing material (paydirt) from the placer deposit after removing the surface vegetation and non-gold-bearing gravel (overburden). The gold is then separated from the other materials in the paydirt by a gravity-separation process known as 'sluicing.'

"In the sluicing process, a miner places the ore in an on-site washing plant (usually a sluice box) which has small submerged dams (riffles) attached to its bottom. He causes water to be run over the paydirt in the sluice box; when the heavier materials (including gold) fall, they are caught by the riffles. The lighter sand, dirt, and clay particles are left suspended in the wastewater released from the sluice box.

"Placer mining typically is conducted directly in steambeds or on adjacent property. The water usually enters the sluice box through gravity, but may sometimes also enter through the use of pumping equipment. At some point after the process described above, the water in the sluice box is discharged. The discharges from placer mining can have aesthetic and water-quality impacts on waters both in the immediate vicinity and downstream. Toxic metals, including arsenic, cadmium, lead, zinc, and copper, have been found at a higher concentration in streams where mining occurs than in non-mining streams.

"It is the treatment of the sluice-box discharge water before it reenters a natural water course that is at the heart of this case."

*Id.* at 1282.

Among the issues raised by the miners, the court was asked to consider whether the discharge of wastewater from the sluice box was, in fact, the discharge of a "pollutant" for purposes of section 402. The court held that it was: "[E]ven if the material discharged originally comes from the streambed itself, such re-suspension may be interpreted to be an addition of a pollutant under the Act." *Id.* at 1285.

Although *Rybachek* did not expressly address the interplay between sections 402 and 404—in fact, section 404

is never mentioned in the court's opinion—the EPA subsequently relied on the case as authority for the proposition that mining wastewater is, in fact, regulated as a pollutant under section 402. And, relying in part on *Rybachek,* the EPA, since 1997, has expressly regulated small suction dredge mining under the NPDES permitting scheme, through general permits not unlike the 700-PM permit at issue here. *See* Reissuance of General NPDES Permit (GP) for Alaskan Small Suction Dredging (Permit Number AKG-37-5000), 72 Fed Reg 20847 (Apr 26, 2007); Final Reissuance of General NPDES Permit (GP) for Alaskan Small Suction Dredging (Permit Number AKG-37-5000), 67 Fed Reg 22082 (May 2, 2002) (reissuing 1997 general permit for small suction dredge mining).

In reissuing those general permits over the years, the EPA in Alaska has specifically rejected the contention that EOMA advances here—that wastewater discharge from suction dredges constitutes the discharge of dredged material within the meaning of section 404. Response to Comments Regarding Reissuance of General NPDES Permit (GP) for Alaskan Small Suction Dredging (Permit Number AKG-37-5000) (2007), *incorporated by reference at* 72 Fed Reg 20847 *and available at* http://yosemite.epa.gov/R10/water.nsf (accessed Dec 16, 2009). After seeking comment on the proposed NPDES permit, the regional director of the Alaska EPA received comments to the effect that small suction dredge permits should be regulated by the Corps under section 404 rather than the NPDES permitting system. In response, the regional director explained that "[s]uction dredges discharge waste water effluent containing rock and sand, which are pollutants under the Act." Response to Comments Regarding Reissuance of General NPDES Permit (GP) for Alaskan Small Suction Dredging (Permit Number AKG-37-5000) (2007), *incorporated by reference at* 72 Fed Reg 20847 *and available at* http://yosemite.epa.gov/R10/water.nsf (accessed Dec 16, 2009). "Courts have determined that wastes from sluicing or other benefication processes related to placer gold mining may be distinct from dredged materials as that term is used in Section 404 of the Act." *Id.* (citing *Rybachek* and other cases).

Moreover, as the regional director explained in his response to comments on the general permit for small suction

dredge mining, the Corps in Alaska has not regulated such discharges from suction dredging operations under section 404. *Id.* In fact, the District Engineer in Alaska issued a public notice in August 2001 in which he asserted that "[t]he Corps does not regulate the excavation by the nozzle of a suction dredge of any size for the recovery of precious metals. *The Corps also does not regulate the effluent from a suction dredge.*" U.S. Army Corps of Engineers, Alaska District Regulatory Branch, Special Public Notice 2001-08 (Aug 16, 2001) (emphasis added).

If that were the sum of the regulatory history of the Corps and EPA, we might conclude that discharges from small suction dredge mining are regulated exclusively under section 402 based on the agencies' shared understanding of the statutory scheme. But there is more. Although for years the Corps declined to regulate discharges from small suction dredges, it apparently did so *not* on the ground that those discharges were outside its regulatory authority but rather on the ground that any discharge of dredged or fill material from a suction dredge would be *de minimis*. In 1994, for example, the Alaska District Regulatory Branch of the Corps issued "Special Public Notice 94-10," in which it explained that,

> "except in extraordinary circumstances, * * * recreational suction dredge mining using an intake nozzle size equal to or less than 4 inches and hand mining in waters of the United States would have *de minimis* effects on the aquatic environment * * *. Therefore, these activities * * * will generally not be regulated by the Corps and no permit is required. However, the Alaska District Corps retains the discretion to require authorization on a case-by-case basis."

The Alaska Regulatory Branch of the Corps took a similar position in a public notice in 2001, when it issued General Permit 88-02P, which pertained to placer mining in Alaska. In the public notice proposing that permit, the Corps referred to Special Public Notice 94-10, and explained that the Corps does not regulate excavation by or effluent from small suction dredges. U.S. Army Corps of Engineers, Alaska District Regulatory Branch, Special Public Notice 2001-08 (Aug 16, 2001) (emphasis added).

However, the Corps in Alaska apparently later changed its position as to whether it would regulate small suction dredging operations. In July 2007, the Corps in Alaska issued General Permit 2007-372, which "authorizes the dredging of and/or the discharge of dredged material into waters of the United States (U.S.), for the purpose of suction dredge mining within the State of Alaska." That general permit, which applies to suction dredge activities using an intake nozzle of 10 inches in diameter or less, states that *"[d]redged material, including spoils and tailings, shall be placed so that it does not pose a hazard to navigation."* In addition to various restrictions on the discharge of dredged material, the permit also provides that "[t]he proposed suction dredge activity shall be in compliance with any applicable National Pollutant Discharge Elimination System permit requirements." U.S. Army Corps of Engineers, Alaska District Regulatory Division, Public Notice 2007-372 (July 3, 2007) (emphasis added).[13]

As the foregoing history demonstrates, the agencies have never drawn a particularly bright line as to which discharges from small suction dredges are regulated by the EPA under section 402 of the Clean Water Act and which are regulated by the Corps under section 404. Nonetheless, they have both regulated small suction dredging operations at different times. As far as we can tell, the agencies have attempted to regulate different discharges (sections 402 and 404 are, of course, mutually exclusive). On the one hand, the Corps has determined that "spoil" and "tailings"—which, when placed back in the water, have the potential to form piles and hence affect navigation—come within its exclusive jurisdiction. On the other hand, the EPA has regulated wastewater effluent, or turbid water containing resuspended solids.

■■ The Corps and EPA's prior practice in implementing sections 402 and 404 of the Clean Water Act is entitled to

---

[13] Apparently, the Alaska permit is not the first Corps permit regulating suction dredge mining. In an appendix, EOMA has also provided a copy of a Regional General Permit (No 21181-98) for suction dredge mining issued by the Army Corps of Engineers in San Francisco. That permit expired in July 2000 but indicates that the Corps was, in fact, regulating discharges from suction dredge mining at that time.

deference, so long as their practice represents a reasonable interpretation of the statutory scheme. *See Coeur Alaska, Inc.*, ___ US at ___ , 129 S Ct at 2477-78 (deferring to prior agency practice regarding interpretation of section 404); *Friends of Columbia Gorge*, 346 Or at 378 ("[W]hen a federal agency has been charged by Congress with implementing a federal statute, courts should defer to that agency's interpretation of the statute, treating that interpretation as controlling as long as it is reasonable."). Here, the agencies' understanding—that the redeposit of dredge spoil and mining tailings from suction dredging operations is "the discharge of dredged material" within the meaning of section 404—is not only a reasonable interpretation of section 404 of the Clean Water Act; it is the most plausible reading of the statutory phrase "discharge of dredged material." As discussed previously, the ordinary meaning of "dredged" material is material that has been "scoop[ed] or [dug] * * * from the bed or body of water," or material "scoop[ed] up or remov[ed] * * * (as in excavating or deepening stream or harbor channels, building levees, or digging ditches) usu. by a series of buckets on an endless chain, a pump or suction tube, or a single bucket or grab at the end of an arm * * *." *Webster's* at 688. In the case of small suction dredges regulated by the 700-PM permit, sediment and water are sucked up by a machine and everything that is not being kept by the miner is then discharged or added back to the water, thereby resulting in piles of mining tailings or, in the case of suspended solids, turbid water downstream. Based on the plain meaning of the language in section 404, the federal regulations defining the discharge of dredged material, and the Corps' implementation of those regulations, we conclude that small suction dredge mining typically involves the placement of dredged spoil and mining tailings in piles and that such a discharge constitutes the

---

[14] The text of *Tulloch II*, which has since been amended, also strongly suggested that suction dredge mining would ordinarily involve the discharge of dredged material. It identified "in-stream mining" as an activity that, at the time the 700-PM permit was issued, the agencies had regarded "as resulting in a discharge of dredged material unless project-specific evidence shows that the activity results in only incidental fallback." 33 CFR § 323.2(d)(2)(i) (2001) (emphasis added); *see* 40 CFR § 232.2(2)(i) (2001). Similarly, the regulatory definition of what *did not* constitute dredged material further suggested that suction dredge mining would result in the discharge of dredged material. Under 33 CFR § 323.2(d)(3)(i) (2001), the discharge of dredged material did not include:

"discharge of dredged material."[14] Such discharges are regulated exclusively by the Corps under section 404, and not the EPA.[15]

■    Meanwhile, the agencies appear to have consistently taken the position that turbid wastewater—*i.e.*, the discharge of water that contains suspended solids—is a pollutant that is regulated by the EPA rather than as the "discharge of dredged material." Again, the EPA has been regulating small suction dredges in Alaska since 1997 with no objection from the Corps; when the Corps did regulate small suction dredge mining, it made no mention of "turbidity," other than to state that any discharges must comply with NPDES permit requirements. Thus, as far as we can tell, the agencies have distinguished between those pollutants that are suspended in wastewater and those that are spoil or tailings discharged by placing them in piles on the stream or river bed. That interpretation of "dredged material"—as *not* including turbid wastewater containing suspended solids—would also appear to be a reasonable one, given the different goals of the two agencies. Whereas the Corps is generally concerned with "dredge" and "fill" matters affecting navigation, the EPA addresses all other types of pollution under section 402; the discharge of dredged material that is resuspended in wastewater (as opposed to forming

"Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state section 404 program."

If *any* processing of dredge yields something other than dredged material, the reference to "*onshore subsequent*" processing would appear to be surplusage. That is, the rule suggested that *simultaneous in-stream processing* of dredged material would yield a different result.

[15] NEDC and the state argue that, in any event, suction dredges do not discharge dredged material at "specified disposal sites" as required by section 404. *See* 33 USC § 1344(a) (providing that the Corps may issue permits "for the discharge of dredged or fill material into the navigable waters *at specified disposal sites*" (emphasis added)). According to NEDC and the state, suction dredge operations can move along streams and are therefore roving activities not confined to "specified disposal sites." In brief, we are not persuaded by that reading of the statute. Nothing in section 404 or the relevant federal regulations suggests that the Corps lacks authority to permit dredging activities simply because those activities have the ability to move and to discharge dredged material in various parts of a body of water.

piles on a stream bed) would seem to have little to do with navigation interests and more to do with pollution control.

With that framework in mind, we return to the permit itself. As we noted at the outset, the 700-PM permit does not identify the particular "discharge" at issue. Although the focus of the permit is certainly "turbidity," it is not limited to discharges of turbid wastewater. Rather, the permit regulates a source of discharges—small suction dredge mining operations. The permit purports to regulate *all* waste discharges from small suction dredges—a broad assertion of regulatory authority that includes, at least on the face of the permit, limitations on discharges of dredged material such as dredged spoil and tailings that are not suspended in wastewater.

That breadth of the permit is problematic. As explained above, the discharge of dredged material (including dredge spoil and tailings that are *not* suspended in wastewater) is within the exclusive regulatory authority of the Corps under section 404. *See Coeur Alaska, Inc.,* ____ US ____ , 129 S Ct at 2467 (explaining that the regulatory schemes under section 402 and 404 of the Clean Water Act are mutually exclusive). Thus, to the extent that EOMA contends that the permit regulates discharges of dredged material, it is correct. Because the discharge of dredged material is within the exclusive regulatory authority of the Corps, the EPA lacks authority to permit those discharges, and, by extension, EQC does not have authority to permit those discharges through its state implementation of the NPDES program.

In sum, small suction dredge mining involves discharges of dredged material that are permitted by the Corps and discharges of turbid wastewater that are permitted by the EPA. The 700-PM permit does not grapple with those distinctions, regulating all discharges of waste from small suction dredge mining without regard to the nature of the discharge. Thus, because of its lack of specificity and consequent overbreadth, the permit exceeds EQC's statutory authority to implement the Clean Water Act.

In Case Number A130703, OAR 340-045-0033(11)(d) held invalid; Case Number A129732 dismissed as moot.