EASTERN OREGON MINING ASSOCIATION;
Guy Michael; and Charles Chase,
*Petitioners-Appellants,*

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY;
Dick Pederson, in his capacity as Director of
the Department of Environmental Quality; and
Neil Mullane, in his capacity as Administrator of
the Water Quality Division of
the Department of Environmental Quality,
*Respondents-Respondents.*

Marion County Circuit Court
10C24263

WALDO MINING DISTRICT,
an unincorporated association;
Thomas A. Kitchar; and Donald R. Young,
*Petitioners-Appellants,*

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY;
Dick Pederson, in his capacity as Director of
the Department of Environmental Quality; and
Neil Mullane, in his capacity as Administrator of
the Water Quality Division of
the Department of Environmental Quality,
*Respondents-Respondents.*

Marion County Circuit Court
11C19071

A156161

398 P3d 449

James L. Buchal argued the cause for appellants. With him on the briefs was Murphy & Buchal LLP.

Michael A. Casper, Assistant Attorney General, argued the cause for respondents. On the answering brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Inge D. Wells, Assistant Attorney General. On the supplemental brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Michael A. Casper, Assistant Attorney General.

Before Armstrong, Presiding Judge, and Egan, Judge, and Shorr, Judge.

**SHORR, J.**

This case returns to us on remand from the Supreme Court. The first issue on remand is whether we will exercise our discretion under ORS 14.175 to decide the otherwise moot issues presented by this case. As discussed below, we decide to exercise our discretion to reach only petitioners' first assignment of error. With respect to the merits of that assignment, we determine, based on our decision in a prior related case, that the trial court did not err in concluding that respondent Department of Environmental Quality (DEQ) had the delegated authority under section 402 of the Clean Water Act[1] to issue the general permit to regulate "visible turbidity" from small suction dredge mining. We decline to exercise our discretion to reach the second through fourth assignments of error.

This litigation and the type of small suction dredge mining permit at issue has a long history. Some background is helpful to understand our opinion. We start with a brief history of the prior related case, which, as we later discuss, resolves our decision on the first assignment of error. The two primary parties involved in this case, petitioner Eastern Oregon Mining Association (EOMA) and respondent DEQ, were also parties to that prior case, *Northwest Environmental Defense Center v. EQC*, 232 Or App 619, 223 P3d 1071 (2009), *rev dismissed*, 349 Or 246 (2010) (*Northwest Environmental Defense Center I*). In that case, petitioners EOMA and other petitioners (collectively petitioners)[2] sought a judicial determination from us under ORS 183.400 that would have invalidated a general discharge permit, which was known as the "700-PM permit," that was issued by DEQ in 2005.[3] 232 Or App at 622. The 2005 700-PM permit placed conditions on the operation of small suction mining dredges in Oregon waters. *Id*. Petitioners are individual small suction

---

[1] As we have done in the past, we refer to the Federal Water Pollution Control Act Amendments of 1972, 33 USC §§ 1251-1387, by the more commonly used "Clean Water Act."

[2] There is some, but not complete, overlap among petitioners in *Northwest Environmental Defense Center I* and petitioners in this appeal.

[3] The 700-PM permit was adopted by DEQ's policy and rule-making board, the Oregon Environmental Quality Commission, and issued by DEQ. *Northwest Environmental Defense Center I*, 232 Or App at 623 n 2.

dredge miners and associations of such miners. Small suction dredge mining generally involves using a gas-powered pump to pull streambed sediments and water through a small intake hose, which passes the material through a sluice tray that separates out gold and other dense particles for collection, and then returns the discharged water and lighter material back into the stream. *Id.* at 623.

In the prior case, petitioners argued to us that the permitting of discharges from small suction dredge mining was within the exclusive regulatory authority of the Army Corps of Engineers (Corps) under the Clean Water Act. *Id.* at 622. In other words, petitioners claimed that DEQ had no authority under federal law to issue the 700-PM permit. Conversely, DEQ argued that it had the delegated authority to issue the permit under the Clean Water Act's National Pollution Discharge Elimination System (NPDES) and ORS 468B.035, by which the state accepted that delegated authority.[4] *Northwest Environmental Defense Center I,* 232 Or App at 622. Broadly stated for these introductory purposes, the Corps has exclusive authority under section 404 of the Clean Water Act to regulate the permitting of the "discharge of dredged or fill material" into navigable waters. 33 USC § 1344(a). Separately, the Environmental Protection Agency (EPA) has the authority under section 402 of the Clean Water Act to regulate the permitting of the "discharge of any pollutant" into navigable waters. 33 USC § 1342(a)(1), (4). As part of the NPDES program, states also have the delegated authority to administer their own permit programs for the discharge of pollutants into navigable waters. *Id.* § 1342(a)(3), (b).

---

[4] Northwest Environmental Defense Center (NEDC), an environmental interest group, was also a party to the prior case and argued that the 700-PM permit was invalid because DEQ "failed to follow certain procedural requirements and because the permit violates aspects of the Clean Water Act." *Northwest Environmental Defense Center I,* 232 Or App at 622.

NEDC is not a party to this case, although issues related to NEDC are raised here. In later litigation, NEDC again challenged DEQ's practices with respect to the issuance of small suction dredge mining permits by filing a petition for review in the circuit court. NEDC ultimately reached a settlement agreement with DEQ that resolved that litigation. As part of this case, petitioners contest DEQ's authority to resolve certain issues relating to the permitting of small suction dredge mining through that settlement agreement rather than through administrative rule-making or contested-case procedures. As discussed below, we do not exercise our discretion to reach that issue.

In December 2009, we issued our opinion in *Northwest Environmental Defense Center I*, which addressed the 700-PM permit that DEQ issued in 2005. We examined whether the small suction dredge mining that was regulated by that 700-PM permit involved the discharge of dredged material, exclusively regulated by the Corps, or the discharge of pollutants, which can be regulated by the state. 232 Or App at 630. We concluded that small suction dredge mining usually "involves the placement of dredged spoil and mining tailings in piles and that such a discharge constitutes the 'discharge of dredged material'" that is regulated exclusively by the Corps. *Id.* at 643-44. However, we further concluded that small suction dredge mining also involves the discharge of "turbid wastewater—*i.e.*, the discharge of water that contains suspended solids." *Id.* at 644. We determined that turbid wastewater sent further downstream is a "pollutant" regulated by the EPA and, by federal statutory delegation, the state. *Id.* at 644-45. We noted that the problem was that the 2005 700-PM permit regulated "*all* waste discharges from small suction dredges," which would include the regulation of both the discharge of "dredged material" that piles up in navigable waterways and turbid wastewater that disperses water and suspended solids further downstream. *Id.* at 645 (emphasis in original).

The United States Supreme Court has held that the regulatory authority granted to the Corps by section 404 (governing, in part, the discharge of "dredged or fill material") forecloses the EPA's authority to act under section 402 (governing the discharge of "any pollutant[s]"). *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 US 261, 274, 129 S Ct 2458, 174 L Ed 2d 193 (2009) (stating that the Clean Water Act "is best understood to provide that if the Corps has authority to issue a permit for a discharge under § 404, then the EPA lacks authority to do so under § 402"). As a result of the encroachment of the 2005 700-PM permit on the Corps' exclusive regulation of the discharge of dredged material (even if the permit also regulated pollutants in the form of turbid wastewater), we held that the permit exceeded the state's "statutory authority to implement the Clean Water Act." *Northwest Environmental Defense Center I*, 232 Or App at 645.

Following our decision in *Northwest Environmental Defense Center I*, the parties sought and initially were allowed review by the Oregon Supreme Court. In the meantime, after our decision, the 2005 700-PM permit expired and was replaced by DEQ in July 2010 by a newly issued 700-PM permit regulating small suction dredge mining. Rather than exercising its rule-making authority, DEQ issued the new permit as an "order in other than a contested case." *See* ORS 468B.050(2) (giving DEQ authority to issue certain permits by rule or order). The new 2010 permit, compared to the 2005 permit, focused on regulating just the discharge of "visible turbidity" in streams and narrowed the permit to respond directly to our decision in *Northwest Environmental Defense Center I*. DEQ stated in an accompanying fact sheet that the 2010 permit was changed expressly to "address[] a pending Oregon Court of Appeals ruling that DEQ had not adequately articulated the basis for prior permit conditions and requirements."

As a result of the expiration of the 2005 permit, the issues in *Northwest Environmental Defense Center I* were rendered moot. *Northwest Environmental Defense Center v. Environmental Quality Commission*, 349 Or 246, 245 P3d 130 (2010) (*Northwest Environmental Defense Center II*). Accordingly, the Supreme Court dismissed the petition for review. *Id.* At that time in our history, our courts did not have the "judicial power under the Oregon Constitution" to decide a moot case even if the issues presented by the case were "capable of repetition, yet evading review." *Yancy v. Shatzer*, 337 Or 345, 363, 97 P3d 1161 (2004), *overruled by Couey v. Atkins*, 357 Or 460, 520, 355 P3d 866 (2015). Thus, the case in *Northwest Environmental Defense Center II* concluded. 349 Or 246.

That brings us to the current litigation, which in many ways is "déjà vu all over again"[5] of the prior litigation. Following DEQ's issuance of the 2010 700-PM permit, the mining petitioners again challenged the small suction dredge mining permit. This time, however, they filed a petition for judicial review in the circuit court under ORS 183.484 challenging the permit (instead of filing directly

---

[5] Attributed to Yogi Berra.

with us as a rule challenge under ORS 183.400).[6] In the operative petition, petitioners ultimately asserted two claims for relief alleging several violations of law. In their first claim for relief, petitioners alleged that DEQ violated federal law in issuing the 2010 700-PM permit because— petitioners claimed again—the permit regulated the discharge of dredged material that was exclusively regulated by the Corps under section 404 of the Clean Water Act, and, accordingly, was not within the EPA and the state DEQ's delegated regulatory authority over the discharge of pollutants under section 402. As part of their first claim, petitioners also contended that DEQ violated state water quality laws in issuing the 2010 700-PM permit. In their second claim for relief, petitioners alleged that a settlement agreement reached between DEQ and NEDC that related to the 2010 700-PM permit violated Oregon law, because it was a privately negotiated agreement that resolved issues that were required to be addressed publicly through either administrative rule making or procedures applicable to the issuance of agency orders. Petitioners sought, among other things, to set aside the 700-PM permit and a declaration that the settlement agreement could not be used to issue any new suction dredge mining permit. DEQ moved for summary judgment on all of petitioners' claims for relief, and petitioners cross-moved for summary judgment on most, but not all, of their claims.

The trial court granted summary judgment to DEQ, agreeing with DEQ on nearly every issue. There are four issues that are relevant to this appeal. First, the trial court concurred with DEQ that it had the delegated authority under section 402 of the Clean Water Act to issue the 2010 700-PM permit to regulate turbid wastewater. Second, the trial court agreed with DEQ that it had the authority under state law to issue the 700-PM permit. Third, the trial court also agreed with DEQ that substantial evidence supported DEQ's decision to issue the 700-PM permit. Fourth, and

---

[6] Several mining petitioners filed two separate petitions for judicial review. The environmental group NEDC filed its own petition for judicial review, which was later resolved by settlement agreement. For ease of reference, we follow the parties' practice of relying on the operative petition filed by lead petitioner EOMA in Marion County Circuit Court Case No. 10C-24263.

finally, the trial court concluded that DEQ had authority to reach a settlement agreement with NEDC that resolved pending litigation, and that DEQ did not have to reach that agreement through either rule-making or contested-case procedures. After the parties stipulated to the resolution of one outstanding issue, the trial court granted DEQ summary judgment on all claims and denied petitioners summary judgment on all claims.

Petitioners then appealed the trial court's judgment. As happened previously with respect to the 2005 permit, the 2010 700-PM permit expired during the pendency of the appeal and a new 2015 permit was issued. *Eastern Oregon Mining Association v. DEQ*, 273 Or App 259, 261, 361 P3d 38 (2015) (*Eastern Oregon Mining Assoc. I*), *rev'd and rem'd*, 360 Or 10, 376 P3d 288 (2016) (*Eastern Oregon Mining Assoc. II*). However, unlike during the prior *Northwest Environmental Defense Center* litigation, when, under *Yancy*, the appellate courts lacked the judicial power to decide moot cases, by the time we issued our decision in *Eastern Oregon Mining Assoc. I*, the Supreme Court had overruled *Yancy*, holding in *Couey* that Oregon courts do have discretion to decide certain otherwise moot cases that are "public actions" or involve "matters of public interest." *Couey*, 357 Or at 520.

*Couey* held that the legislature had the authority under the Oregon Constitution to enact ORS 14.175,[7] which confirms the authority of Oregon courts to consider otherwise moot cases if they meet three statutory factors. 357 Or at 463. We applied those factors in *Eastern Oregon Mining Assoc. I* and held that the issues presented did not satisfy the third factor, which requires that "[s]imilar acts[] are

---

[7] ORS 14.175 provides, in part, that, in any action in which a party alleges that a certain government act, policy or practice is unconstitutional or otherwise contrary to law,

"the party may continue to prosecute the action and the court may issue a judgment on the validity of the challenged act, policy or practice even though the specific act, policy or practice giving rise to the action no longer has a practical effect on the party if the court determines that:

"(1) The party had standing to commence the action;

"(2) The act challenged by the party is capable of repetition, or the policy or practice challenged by the party continues in effect; and

"(3) The challenged policy or practice, or similar acts, are likely to evade judicial review in the future."

likely to evade judicial review in the future." 273 Or App at 262. We concluded that a future "challenge to the 2015 permit is not likely to evade judicial review" and that petitioners could use the accumulated work from their challenge to the 2010 permit to challenge the 2015 permit. *Id.*

On review, the Supreme Court disagreed and concluded that petitioners had met each of the three factors under ORS 14.175. *Eastern Oregon Mining Assoc. II*, 360 Or at 19. The Supreme Court remanded the case to us to decide whether we would exercise our discretion to review the issues in this otherwise moot case. *Id.* With that long procedural history stated and our stage set, we turn to the two issues presently before us. First, we consider whether we should exercise our discretion to reach some or all of the otherwise moot issues presented by petitioners' four assignments of error. Second, after deciding to consider just petitioners' first assignment of error, we consider whether the trial court erred in determining that DEQ had the authority to issue the 2010 700-PM permit under section 402 of the Clean Water Act.

We consider first whether to exercise our discretion to consider any of the issues on appeal. As stated above, petitioners raise four assignments of error arising from the trial court's grant of DEQ's motion for summary judgment and the denial of petitioners' cross-motion for summary judgment. Petitioners urge us to exercise our discretion to consider the merits of all four assignments of error. In response, DEQ agrees that we should consider the first assignment of error, regarding whether DEQ had authority under the Clean Water Act to issue the 2010 700-PM permit to regulate turbid wastewater. It contends, however, that we should not consider the remaining three assignments. As we discuss below, we agree with DEQ and choose to address only petitioners' first assignment of error.

There has been little, if any, guidance since *Couey* on what should guide our exercise of discretion to consider the merits of otherwise moot issues. *See, e.g., Hooper v. Division of Medical Assistance Programs*, 273 Or App 73, 84, 356 P3d 666 (2015) (concluding that we will exercise our discretion under ORS 14.175 and noting "the ongoing

relationship between the parties and the petitioner's need for the medical transportation service ultimately at issue"). *Couey*, however, offers potential guideposts in its review of the history of the mootness doctrine.

In *Couey*, the Supreme Court concluded that mootness is a prudential, rather than a constitutional, constraint on justiciability in cases involving "public actions" or "matters of public interest." 357 Or at 520. The court noted that the legislature's enactment of a statute, ORS 14.175, to permit consideration of certain otherwise moot cases merely codified the historical practice of courts to consider whether to exercise their judicial power under the Oregon Constitution over such cases. 357 Or at 521 (stating that "[s]uch legislation purports to confer no more authority than what we have just concluded the courts possess under Article VII (Amended), section 1"). Consequently, considering that *Couey* carefully discussed the history of the prudential justifications for addressing certain otherwise moot cases, we find it appropriate to look to those same justifications when deciding whether to exercise our discretion to consider the issues in this case. *See Eastern Oregon Mining Assoc. II*, 360 Or at 15 (stating that "[e]xisting case law on the subject of mootness offers guidance concerning the circumstances under which the court will continue to dismiss moot claims" even when considering just prudential considerations).

Although the following list is not exhaustive, we identify several significant considerations bearing on whether to exercise our judicial power over moot cases involving "public actions" or "matters of public interest." *Couey*, 357 Or at 520. Those factors may include, but are not limited to, the adversarial nature of the parties' interests, the effect of the decision on both the parties and others not before the court, judicial economy, and the extent of the public importance of the issues presented.

First, *Couey* recognized that the nature of the parties' adverse interests may guide a court's exercise of discretion in considering whether to decide otherwise moot cases. In *Couey*, when reviewing the historical prudential justifications for dismissing moot cases, the court observed that

early courts dismissed moot cases to avoid creating "'rules for the government of cases in which the *real parties* would have had no opportunity to be heard.'" 357 Or at 500 (quoting *Smith v. Cudworth*, 41 Mass 196, 197 (1837) (emphasis added)). Relatedly, existing case law on the issue of mootness has also considered whether the "court's decision no longer will have a practical effect on or concerning the rights of the parties." *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993).[8] Given that history, when deciding whether to exercise our discretion, we conclude that it is appropriate to consider whether the parties' interests remain adverse as to future disputes that are likely to recur. Second, and relatedly, we may also consider whether the parties are advocating only narrow arguments and rules of law that may benefit just themselves or are presenting arguments affecting a wider group of parties or interests.

Third, *Couey* recognized "judicial economy" as a factor that past courts have considered when deciding whether to exercise judicial power over moot cases. 357 Or at 501. Courts disposed of moot cases, in part, to avoid "'decid[ing] questions which might never arise.'" *Id.* at 500 (quoting *Smith*, 41 Mass at 197). Of course, ORS 14.175 already provides that we are to consider whether an act challenged by a legal action is "capable of repetition" and yet "likely to evade judicial review." ORS 14.175(2) - (3). However, in deciding whether to exercise our discretion, we may dig deeper to consider if the challenged act is likely to arise *often*. We may also consider whether judicial economy supports addressing the issue presented by the litigation before us based on the existing record and circumstances or whether another, future case might present a more developed record or more thoroughly developed arguments.

---

[8] Of course, in "public action" cases or those involving "matters of public interest," the court first considers those same two factors in determining *whether* a case is moot before turning to the test in ORS 14.175(1) to (3) and then whether to exercise discretion to consider the otherwise moot case. *See, e.g., Eastern Oregon Mining Assoc. II*, 360 Or at 15-19 (undertaking analysis). The application of those factors, even if they have already been addressed as part of mootness analysis, may still be relevant to the later issue of whether to exercise discretion to consider the issues in the case. The parties' interests may or may not be adverse in the future even if the litigation at issue has been resolved. As is the case here, petitioners and DEQ appear likely to have adverse interests into the future.

Considering judicial economy as a relevant factor is also consistent with our decisions in other similar areas where we exercise discretion. For example, in plain-error analysis, we will often exercise our discretion to correct plain error where not doing so would "waste further judicial resources." *State v. Simkins*, 263 Or App 459, 461, 330 P3d 1235 (2014).

Fourth, *Couey* recognizes the relative "public importance" of a case as a historical consideration in guiding courts' discretion to exercise judicial power over otherwise moot cases. 357 Or at 508, 510-11, 519, 521-22. That includes consideration of the "public interest" in the issues involved as well as the universe of people and interests potentially affected by the challenged rule or practice. *Id.* at 508. *Couey* concludes that the Oregon Constitution does not *"require* dismissal" of a case that is moot if it is a "public action[]" or one involving "matters of public interest." *Id.* at 520 (emphasis in original). The facts in *Couey* did not require the Supreme Court to "define the outer limits of what might constitute a 'public action' or one involving issues of 'public interest'" for the purpose of determining the authority of a court to decide an otherwise moot case. *Id.* at 522. Although we do not undertake to define those outer limits here either, we conclude that courts may consider the relative public importance of the issues and the universe of people or interests potentially affected as part of its exercise of discretion.

As stated, this list is not exhaustive. In addition, some factors could be in conflict but still lead a court to exercise discretion to hear a moot case or issue. For instance, a challenged practice may not be likely to repeat very often in the future, but it may have such widespread public effect and importance that the latter factor still leads us to exercise our discretion.

Applying those factors here, we conclude that we should exercise our discretion to consider the issues presented in petitioners' first assignment of error, but not the second through fourth assignments of error. As part of their first assignment of error, petitioners contend that the trial court erred in concluding that DEQ had authority under federal law, *viz.*, section 402 of the Clean Water Act, to issue a

permit that regulates petitioners' small suction dredge mining. We conclude that the discretionary factors that we discuss above—(a) the past and continuing adversity of the parties' interests, (b) the application of the disputed federal and state laws to wider interests than those of the parties themselves, (c) judicial economy, and (d) the relative public importance of the case and the breadth of people and interests potentially affected—support resolving that assignment of error. These same parties have been litigating a nearly identical legal issue for years, and there is no indication that the litigation of these issues will end if we dismiss this appeal as moot. Indeed, DEQ has issued a new 700-PM permit that relies on section 402 of the Clean Water Act as a continuing source of its authority to regulate small suction dredge mining. The litigated issues certainly affect the parties, but they also affect a wider class of interests—those interested in the proper regulation and practice of small suction dredge mining, including government, environmental, and mining interests. Judicial economy also favors considering the first assignment of error. The factual record has been completely and well developed. The first assignment presents a legal issue. The parties have already developed and presented their arguments to the court twice—each time being prevented from reaching a conclusion due to mootness. Refusal to consider petitioners' argument on the first assignment of error would lead to a waste of further judicial resources in developing the factual and legal issues again in new litigation. Finally, although we do not consider this a matter of overarching public importance, it raises a significant issue that affects the public interests noted above.

In their second assignment of error, petitioners argue that the trial court erred in concluding that DEQ properly issued the 2010 700-PM permit under state law. Although petitioners' argument in this assignment is not entirely clear, they appear to argue that, although the 2010 700-PM permit "purports" to be issued under state law, ORS 468B.050, as well as the federal Clean Water Act, it actually is solely authorized, incorrectly in petitioners' view, under the Clean Water Act and contains requirements unique to federal law. DEQ, in response, appears to contend that its authority is under "both" state and federal law in furtherance

of the "partnership" contemplated by the Clean Water Act—presumably the state's delegated authority under section 402 of the Clean Water Act to issue NPDES permits. In their reply brief, petitioners then argue that "whether or not [DEQ] might exercise state-law-based regulatory power * * * is not before this Court" and asks us to remand the case back to DEQ for new permitting under state law or possibly under different authority, *viz.*, section 401 of the Clean Water Act.

Without reaching the merits of this dispute, we choose not to exercise our discretion to reach petitioners' second assignment of error because the argument, as framed by the parties, is not well developed for this court and may be quite narrow. Both parties' arguments can be read to contend that the *purely* state-law issues are not even properly before us. For that reason, we will not reach them.[9]

We also do not exercise our discretion to reach petitioners' third and fourth assignments of error. In the third assignment of error, petitioners contend that the trial court erred in concluding that DEQ's findings were supported by substantial evidence. Without discussing each of the discretionary factors that apply here, we find most persuasive that this assignment of error raises a case-bound question that, although perhaps significant to this now-mooted case, does not present a recurring legal issue that has implications beyond this particular litigation. Petitioners also no longer have any ongoing or future "adverse interest" in whether the 2010 700-PM permit is supported by "substantial evidence." Petitioners are no longer subject to that expired 2010 permit and, significantly, the 2015 permit is based on a different factual record.

---

[9] There is a chance that there may be new state laws with respect to small suction dredge mining in the coming years. In 2013, the legislature passed Senate Bill (SB) 838, which imposed a moratorium on suction dredge mining from January 2, 2016, until January 2, 2021, in "any river and tributary thereof" that contains "essential indigenous anadromous salmonid habitat * * * or naturally reproducing populations of bull trout," except where the populations do not exist due to a "naturally occurring or lawfully placed physical barrier to fish passage." Or Laws 2013, ch 783, § 2. Although mining interests opposed this law, no party contends in this case that that law currently effectively bans all small suction dredge mining in Oregon rivers and streams due to the absence of sufficient riverbed or streambed for mining. *See Bohmker v. State of Oregon*, 172 F Supp 3d 1155, 1165 (D Or 2016) (stating that SB 838 restricts dredge mining in only limited areas and provides exceptions even within prohibited areas).

In the fourth assignment of error, petitioners argue that the trial court erred in concluding that DEQ had the authority to resolve a pending lawsuit, in the manner that it did, without going through a contested-case hearing or through rule-making procedures. Again, without discussing each factor, we do not exercise our discretion to consider this issue. The procedures governed by the settlement agreement, which was between DEQ and a third party not currently involved in this litigation, are already completed. The legal issues presented by the settlement agreement are narrow issues that do not appear to us to have widespread effect and are not matters of significant public importance.

Finally, we turn to the merits of the dispute over the first assignment of error. Petitioners assign error to the trial court's grant of summary judgment to DEQ and denial of it to petitioners on petitioners' first claim for relief. That claim alleged that DEQ lacked authority to issue the 2010 700-PM permit because the permit regulates the discharge of dredged materials, which is under the exclusive regulatory authority of the Corps under section 404 of the Clean Water Act. Petitioners contend that the trial court legally erred in concluding that DEQ had the authority to issue the 2010 700-PM permit. In that circumstance, we review to "determine if the trial court correctly interpreted and applied the correct legal standards." *Powell v. Bunn*, 185 Or App 334, 340, 59 P3d 559 (2002), *rev den*, 336 Or 60 (2003).[10]

---

[10] As noted at the outset of this opinion, petitioners initially sought review of DEQ's permitting decision in the circuit court under ORS 183.484, which provides for circuit court review of orders in "other than contested cases." Petitioners then appealed the circuit court's judgment, challenging the trial court's adverse summary judgment decision. The standard of review we apply to an appeal of a circuit court decision granting summary judgment in a typical civil action differs from that applied to an appeal of a circuit court decision granting summary judgment to an agency following judicial review under ORS 183.484 of an order in "other than contested cases." *Powell*, 185 Or App at 339-40. That difference in the standard of review can be significant where the appeal arises from claimed disputed factual issues in the trial court. *Id.* (explaining application of substantial evidence standard of review to trial court decision granting summary judgment to agency following review under ORS 183.484 of an agency order that is in "other than a contested case"). Where, as here, the issue is purely legal, "although the standards of review that apply to the civil action and the review proceeding differ, ultimately they converge, because the inquiry for both is legal only." *Id.* at 340.

Petitioners' essential argument is that the 2010 700-PM permit, even if it purports to be limited to regulating visible turbidity, improperly regulates the discharge of "dredged material," which is within the exclusive regulatory authority of the Corps under section 404 of the Clean Water Act. We understand that petitioners are primarily advancing two arguments. First, petitioners contend, as both a factual and legal matter, that the discharge from small suction dredges is a "single discharge" that cannot be "parsed" into two components, the discharge of "dredged material" (regulated by section 404 of the Clean Water Act) and the discharge of "pollutants" (regulated by section 402 of the Clean Water Act). Second and relatedly, petitioners argue that small suction dredges *only* discharge "dredged material" and do not discharge "pollutants."

Those arguments, however, have already been rejected by our reasoning, if not also our conclusions, in *Northwest Environmental Defense Center I*, 232 Or App at 645. In that case, we extensively analyzed the relevant sections of the Clean Water Act, the federal regulations that define the term "dredged material" and distinguish it from pollutants, and the history of the Corps' and EPA's treatment and regulation of in-stream mining activities. *Id.* at 626-45. After undertaking that extensive analysis, we concluded that small suction dredge mining "typically involves the placement of dredged spoil and mining tailings in piles and that such a discharge constitutes the 'discharge of dredged material' *** regulated exclusively by the Corps under section 404, and not the EPA." *Id.* at 643-44. We went on to state, however, that federal agencies have

"consistently taken the position that turbid wastewater— *i.e.*, the discharge of water that contains suspended solids— is a pollutant that is regulated by the EPA rather than the 'discharge of dredged material.' *** Thus, as far as we can tell, the agencies have distinguished between those pollutants that are suspended in wastewater and those that are spoil or tailings discharged by placing them in piles on the stream or river bed. *** Whereas the Corps is generally concerned with 'dredge' and 'fill' matters affecting navigation, the EPA addresses all other types of pollution under Section 402."

*Id.* at 644. In light of our analysis, and relying on that regulatory history, we concluded that, "small suction dredge mining involves discharges of dredged material that are permitted by the Corps and discharges of turbid wastewater that are permitted by the EPA." *Id.* at 645. In light of that conclusion, we determined that the 2005 700-PM permit lacked specificity and was overly broad in that it regulated all suction dredge mining waste discharge, spanning both the Corps' and EPA's (and by delegation DEQ's) exclusive regulatory authority. *Id.* We concluded that the 2005 permit exceeded DEQ's statutory authority to implement the Clean Water Act. *Id.*

*Northwest Environmental Defense Center I* addresses both of petitioners' primary arguments to us. It concluded, contrary to petitioners' arguments, that small suction dredge mining did involve the discharge of *both* "dredged material" within the exclusive regulatory authority of the Corps and turbid wastewater, which we concluded was a "pollutant" within the EPA's (and DEQ's) regulatory authority. *Id.* at 644-45. Although we concluded that the 2005 permit was overly broad in regulating both discharges, we at least necessarily implied, if we did not overtly state, that a new permit that regulated solely "turbid wastewater" as a pollutant from small suction dredge mining would be within DEQ's delegated statutory authority under section 402 of the Clean Water Act. *Id.* In the 2010 permit, DEQ expressly limited the permitting to the regulation of the discharge of "turbid wastewater." Indeed, no party before us claims otherwise.[11] *Northwest Environmental Defense Center I* rejects the argument that small suction dredge mining necessarily results in a single discharge that can be regulated by only one regulatory authority.

In a related manner, *Northwest Environmental Defense Center I* expressly rejects petitioners' second argument that small suction dredge mining waste is only "dredged material" and not a "pollutant." *Id.* at 645. As

---

[11] The 2010 700-PM permit also has restrictions on the times of day that persons can engage in small suction dredge mining and different limitations on the practice in particular Oregon rivers and areas designated "essential salmon habitat." No one argues that those permit restrictions are relevant to our decision or otherwise in violation of the Clean Water Act.

discussed above, we concluded that it can be both, and that small suction dredge mining results in the downstream discharge of turbid wastewater, a pollutant regulated by the EPA. *Id.* at 643-44.

Petitioners make a number of arguments as to why *Northwest Environmental Defense Center I* was wrongly decided. However, many of petitioners' arguments were previously made and rejected in that case. The remaining arguments do not persuade us to reconsider our prior decision. *See State v. Civil*, 283 Or App 395, 406, 388 P3d 1185 (2017) (stating that we will only overturn prior precedent where it is "'plainly wrong,' a rigorous standard grounded in presumptive fidelity to *stare decisis*"). Without addressing all of those arguments, we briefly address three of petitioners' contentions that they claim are either recent developments or were not argued or addressed in our prior opinion.

First, petitioners argue that our prior decision did not address the Clean Water Act's definition of a "discharge of a pollutant," which includes "any addition of any pollutant to navigable waters from any point source." 33 USC § 1362(12)(A).[12] Petitioners argue that, even though "dredged spoil," "rock," and "sand" are defined "pollutant[s]" under the Clean Water Act, 33 USC § 1362(6), the vacuum and release of sediment on streambeds cannot involve the "addition" of a pollutant because the same sediment is sent downstream and no additions are made. Although our opinion did not cite 33 USC section 1362(12), we did address whether suction dredge mining involved the "addition" of pollutants. *Northwest Environmental Defense Center I*, 232 Or App at 639. We relied, in part, on a conclusion from the Ninth Circuit Court of Appeals that, when suction dredge mining pulls up sediment, sifts out gold and heavy materials, and returns the remaining resuspended soils downstream, "'even if the material discharged originally comes from the streambed itself, such re-suspension may be interpreted to be an addition of a pollutant under the [Clean Water] Act.'" *Id.* (quoting *Rybachek v. U.S. E.P.A.*, 904 F2d 1276, 1285

---

[12] Petitioner EOMA concedes that it previously told us in *Northwest Environmental Defense Center I* that it did not believe that we needed to resolve whether suction dredge mining resulted in an "addition" of a pollutant to resolve that case.

(9th Cir 1990) (brackets omitted)); *see also Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F3d 810, 814-15 (9th Cir 2001) (practice of "deep ripping" a wetland, which involves churning up soil already there and redepositing it, is a "discharge" and addition of a pollutant).

Second, petitioners contend that a recent United States Supreme Court decision, *Los Angeles County Flood Control Dist. v. Natural Resources Defense Council, Inc.*, 568 US 78, 133 S Ct 710, 184 L Ed 2d 547 (2013), is "irreconcilable" with *Northwest Environmental Defense Center I.* (Emphasis omitted.) However, *Los Angeles County Flood Control Dist.* merely held that the flow of water from one improved concrete channel of a river to a lower unimproved portion of the same river was not a discharge of pollutants under the Clean Water Act. 568 US at 82, 133 S Ct at 713. It does not address a qualitatively different practice in which a suction pump pulls up streambed in a river, sifts out gold and heavy particles, and sends reconstituted and resuspended soils with water further down river.

Third, petitioners contend that we failed to consider that Congress gave the EPA authority under section 404(c) of the Clean Water Act to prohibit or restrict permits issued by the Corps under that section. *See* 33 USC § 1344(c) (providing that the EPA administrator may prohibit or restrict a permit issued by the Secretary of Army if the administrator determines that the discharge of dredged or fill material will have "an unacceptable adverse effect" on municipal water supplies, shellfish beds, fisheries, wildlife, or recreational areas). Petitioners argue that our decision to allow the EPA (or DEQ) and the Corps to issue separate permits under sections 402 and 404 to regulate, respectively, the discharge of pollutants and the discharge of dredged material by a single suction dredge renders the EPA's veto authority under section 404(c) meaningless. We do not agree with that reasoning. The fact that the EPA may regulate the discharge of pollutants from a source, even when the same source discharges dredged material regulated by the Corps, does not render meaningless the EPA's veto authority when it determines, perhaps for completely independent reasons, that a permit issued by the Corps for dredged material under section 404 has unacceptable adverse effects on

municipal water supplies, fish habitat, or other environmental considerations.

For the reasons stated above, we exercise our discretion under ORS 14.175 to reach the issues presented by petitioners' first assignment of error. When addressing those issues, we conclude, as did the trial court, that DEQ had the delegated authority under section 402 of the Clean Water Act to issue the 2010 700-PM permit to regulate visible turbidity resulting from small suction dredge mining. *See* ORS 14.175 (stating that the court "may issue a judgment on the validity of the challenged act, policy or practice" even though the underlying action is otherwise moot). We do not exercise our discretion under ORS 14.175 to reach the issues presented by the second through fourth assignments of error.

Portion of judgment concluding DEQ had authority to issue 2010 700-PM permit under section 402 of the Clean Water Act affirmed; otherwise declining to address remaining moot issues under ORS 14.175.