BALMER, J., dissenting.
The majority opinion reaches a result that may be sensible, but takes a path that is closed off by the federal caselaw that we are bound to follow. When an agency reasonably interprets an ambiguous statute by promulgating a **355 rule, we must give deference to its interpretation. Here, the two agencies charged with administering the Clean Water Act (CWA) created rules interpreting some of its ambiguous terms; those definitions, to which we must defer, clearly resolve this case in petitioners' favor. The majority colors outside the lines of agency deference, and in the process ends up interpreting the statute by deferring to certain actions of the two federal agencies involved here, and perhaps to their desires, but not, as we must, to their duly promulgated interpretation of the Clean Water Act. I respectfully dissent.
The CWA imposes responsibilities on both the Army Corps of Engineers and the Environmental Protection Agency (EPA). Section 402, administered by the EPA, gives that agency permitting authority over "the discharge of any pollutant." 33 USC § 1342(a)(1). The Corps, under section 404, "may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 USC § 1344(a). But that authority does not overlap. "If the Corps has authority to issue a permit, then the EPA may not do so." Coeur Alaska, Inc. v. Southeast Alaska Conservation Council , 557 U.S. 261, 275, 129 S. Ct. 2458, 174 L. Ed. 2d 193 (2009).
In 2010, Oregon's Department of Environmental Quality (DEQ) issued a general permit for suction dredge mining under the authority of section 402. DEQ issued the general permit on the understandable theory that suction dredge mining involves the release of dirt and gravel into the water, creating a plume of turbidity that is the "addition of a pollutant." Petitioners argue that DEQ exceeded its authority under section 402 because, even if the release of dirt and gravel from suction dredge mining would otherwise constitute the "discharge" or "addition" of a pollutant, it is a "discharge of dredged *** material" under section 404 and therefore properly subject to permitting only by the Corps.
This case therefore turns on the meaning of the phrase "discharge of dredged * * * material" in section 404. "When a court reviews an agency's construction of the statute which it administers,"
**356 Chevron U.S.A. v. Natural Resources Defense Council , 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), it is bound to apply an interpretive canon known as Chevron deference. Chevron involves a two-step inquiry. At the first step, the court interprets the statute "employing traditional tools of statutory construction ***." Id. at 843 n. 9, 104 S. Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id . at 842-43, 104 S Ct 2778. At the second step, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S Ct 2778. "Even under that deferential standard, however, 'agencies must operate within the bounds of reasonable *275 interpretation.' " Michigan v. EPA , --- U.S. ----, 135 S. Ct. 2699, 2707, 192 L. Ed. 2d 674 (2015) (quoting Utility Air Regulatory Group v. EPA , 573 U.S. 302, 321, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014) ).
Chevron does not require deference to all agency interpretations, because Chevron depends on the scope of Congress's delegation to the agency and how the agency has set forth its interpretation. However,
"administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."
United States v. Mead Corp ., 533 U.S. 218, 226-27, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001).
I begin with the first step, interpreting CWA section 404 itself, and determining whether suction dredge mining involves "the discharge of dredged or fill material into the navigable waters ***." 33 USC § 1344(a). It could be argued that this text is enough to settle the case. After all, suction dredge mining does "dredge" material. And, in a literal sense, that material is then "discharged" into water. But suction dredge mining also involves passing that dredged material over a sluice tray in order to separate out gold. It may be that dredged material remains dredged material indefinitely. But it might reasonably be thought that in some circumstances material that has been dredged will cease to **357 qualify as dredged material. For example, the gold removed from the stream may be "dredged material" initially, but it might be anomalous to refer to it as "dredged material" once it has been turned into a wedding ring. Additionally, the context of section 404 is relevant. The words "discharge of dredged or fill material" demarcate the jurisdictional line between the EPA and the Corps, and thus might be read in a way that takes into account the relative competencies of the agencies-such as by focusing on the purpose or the environmental effects of the discharge. Thus, at Chevron step one, I find the statute ambiguous.
Chevron 's first step being satisfied, it is appropriate to turn to agency interpretations. The Corps and the EPA have promulgated rules, through notice and comment rulemaking, to clarify the definitions of "dredged material" and "discharge of dredged material." Those rules, which were most recently revised in 2008, define dredged material as follows:
"The term dredged material means material that is excavated or dredged from waters of the United States."
33 CFR § 323.2(c).[1] Thus, "dredged material" is defined based solely on the source of the material-the waters of the United States-and the process by which it is removed-excavation or dredging. There is no temporal caveat, and no qualification based on subsequent processing or environmental effects.[2] To read the definition to be conditioned on such requirements would require a judicial addition to the rule's text, which would be entirely inconsistent with the **358 Supreme Court's directive that we "must employ traditional tools of interpretation" to interpret regulations. Christopher v. SmithKline Beecham Corp ., 567 U.S. 142, 161, 132 S. Ct. 2156, 183 L. Ed. 2d 153 (2012).
To be sure, an interesting question would be raised if we were faced with a mixture of dredged material and some other substance which had not been "excavated or dredged from waters of the United States." The definition does not, perhaps, speak clearly to the question of whether such a mixture, or a *276 portion thereof, would constitute "dredged material." Suction dredge mining, however, processes material only by removing part of it. All of the remaining material, absolutely everything ultimately added to the water, was "excavated or dredged from waters of the United States."
Because everything released by suction dredge mining is "dredged material," the next question is whether the release of that material into the water qualifies as "discharge of dredged material":
"(d)(1) Except as provided below in paragraph (d)(2), the term discharge of dredged material means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States."
33 CFR § 323.20(d)(1). Leaving aside, for the moment, the exceptions, this definition also favors the Corps' authority. The material released from suction dredge mining, all of which is "dredged material," is released into-added to-the water. Thus, it is captured by "any addition of dredged material into *** the waters of the United States."
I turn to the exceptions set out in paragraph (d)(2):
"(2) The term discharge of dredged material does not include the following:
"(i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable State section 404 program.
**359 "(ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chainsawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.
"(iii) Incidental fallback."
33 CFR § 323.20(d)(2). The first exception confirms that "dredged material" does include material that has subsequently been processed, including that which has been processed onshore. If it did not, then subparagraph (d)(2)(i) would be superfluous-it would serve no purpose to exclude from the definition of "discharge of dredged material" the release of something that was not "dredged material" in the first place. See Corley v. United States , 556 U.S. 303, 314, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) (referring to the rule against superfluities as "one of the most basic interpretive canons").
The exclusion from the Corps' jurisdiction of certain subsequently processed material also shows that the Corps and the EPA considered how to handle processed dredged material. And the only exception to the Corps' jurisdiction related to processing is not one that applies here. To fall under subparagraph (d)(2)(i), and thus be subject to permitting under section 402 rather than section 404, the processing must be "onshore," and the dredged material must be "extracted for any commercial use (other than fill)." It could reasonably be disputed whether the second condition is satisfied here-many suction dredge miners are hobbyists-but the first is not. Suction dredge mining typically involves processing that is not "onshore," and DEQ's permitting scheme-and certainly its assertion of authority over petitioners' in-stream suction dredging-reaches beyond onshore processing.
The agencies' regulations interpret the ambiguous terms "dredged material" and "release of dredged material," and they do so reasonably. The definitions that they have selected are natural and permissible constructions of the statutory text. Under Chevron , the deferring court "need not conclude that the agency construction was the only one it **360 permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Chevron , 467 U.S. at 843 n. 11, 104 S.Ct. 2778. The definitions contained in the rules therefore pass Chevron 's second step. Because those rules were adopted through notice and comment rulemaking, and agreed on both agencies charged with administering the *277 relevant sections of the CWA,[3] they satisfy Mead . This is heartland Chevron territory, and we are bound to defer to the agencies' interpretation.
The majority does not dispute that the 2008 rules are owed deference, but concludes that those rules are best read not to speak, one way or the other, to the question at hand. However, the majority's analysis of the definition of "discharge of dredged material" places heavy reliance on a textual ambiguity that no longer exists. The majority reasons that the 1975 version of the same regulation sets forth a "general rule" that "redeposit of unprocessed dredged material into navigable water will constitute the 'discharge of dredged material,' " Eastern Oregon Mining Assoc. v. DEQ , 365 Or. 313, 329, 445 P.3d 251 (2019) ; that there is an exception for some dredged material that is processed onshore; and that "the rule leaves unanswered whether other categories of water-based or land-based processing operations will result in the 'discharge of dredged material' that requires a permit from the Corps under section 404," Id. at 329, 445 P.3d at 260.
It does not matter whether that was a permissible reading of the 1975 regulation; it is clearly foreclosed by the current text of 33 CFR § 323.2(d)(1), promulgated in 2008:
"Except as provided below in paragraph (d)(2) , the term discharge of dredged material means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States."
**361 (Emphasis added.) The present structure of the definition makes clear that aside from redeposit of "incidental fallback" and the express exceptions contained in paragraph (d)(2), every other "addition of dredged material" is a "discharge of dredged material." There is no longer-if there ever was-a phantom category of dredged material additions that the definition simply does not address. The only exception for processed dredged material is the express exception contained in subparagraph (d)(2)(i).
Having brushed past the easy answer, the majority wends through a thicket of past regulatory decisions by the EPA and the Corps. Those materials, which postdate the statute, are not relevant to our Chevron step one interpretation of section 404, using the ordinary tools of statutory construction. Instead, the majority interprets section 404 by deferring, under Chevron , to a few of those agency materials: a general permit issued by the EPA in Idaho in 2018, and general permits issued by the Corps and the EPA in Alaska over the past decade.
Any attempt to defer to those materials faces an insurmountable hurdle. Chevron requires deference to an agency's interpretation of a statute, but nothing in the permits, or even in the associated materials, contains an interpretation of section 404 or any of its terms. Of course, implicit interpretations can still merit deference. In National Railroad Passenger Corporation v. Boston & Maine Corp ., 503 U.S. 407, 420, 112 S. Ct. 1394, 118 L. Ed. 2d 52 (1992), the Supreme Court reasoned that
"the fact that the ICC did not in so many words articulate its interpretation of the word 'required' does not mean that we may not defer to that interpretation, since the only reasonable reading of the Commission's opinion, and the only plausible explanation of the issues that the Commission addressed after considering the factual submissions by all of the parties, is that the ICC's decision was based on the proffered interpretation."
That case, however, involved a situation where it was clear, at least contextually, that the agency had interpreted the statute and what the interpretation was. When those features are lacking, courts typically do not defer to implicit **362 interpretations. As the D.C. Circuit explained in declining to defer to an agency manual,
*278 "even if we were prepared to accord Chevron deference to the PRO Manual, that document contains no interpretation of [the statute] to which we might defer. * * * Most important, there is no place in the manual where the agency explains why it believes that a PRO satisfies the statutory injunction to inform a complainant of the 'final disposition' of the complaint simply by telling him that it has investigated the matter and will take action if appropriate. Because the manual thus contains no reasoning that we can evaluate for its reasonableness, the high level of deference contemplated in Chevron 's second step is simply inapplicable."
Public Citizen, Inc. v. U.S. Department of H.H.S. , 332 F.3d 654, 661 (D.C. Cir. 2003) (emphasis in original); see also Former Employees, Marathon Ashland Pipe Line v. Chao , 370 F.3d 1375, 1382 n. 2 (Fed. Cir. 2004) (expressing confusion about deference to an implicit interpretation because "it is not entirely clear what it is that the government wishes us to defer to").
The non-overlapping authority of the EPA and the Corps means that when EPA issues a general permit under section 402, it must have concluded that the permitted activity is not the subject of the Corps' permitting authority under section 404. Similarly, the Corps permits state that the EPA has authority over suction dredge mining. But none of that allows us to discern what either agency understood "discharge," "dredged material," or any other statutory term in section 404, to mean (much less that they agreed on an interpretation). The majority does not hazard a guess as to what their interpretation is. Therefore, rather than assessing the agency interpretation of the statute for reasonableness, as Chevron 's second step requires, the majority evaluates only the reasonableness of its practical consequence-that the EPA rather than the Corps gets to regulate suction dredge mining. See 365 Or. at 351-52, 445 P.3d at 272-73.
Moreover, it is doubtful that the agencies' analysis of section 404 extended any further than concluding (as they must) that the answer really turns on the meaning of the more specific definitions contained in 33 CFR § 323.2, not the bare text of the CWA. Consequently, the permitting **363 decisions that the majority relies on are very likely interpretations of the agencies' regulations , not a statute. That interpretation would be entitled to deference, if at all, not under Chevron , but under Auer v. Robbins , 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997), which requires courts, when interpreting regulations, to defer to the agency's interpretation of its own regulations. Not long ago, the distinction might not matter in a case like this one, because Auer was generally understood to give even more deference to agency interpretations of rules than is accorded to agency interpretations of statutes under Chevron . However, the Supreme Court recently emphasized that it "has cabined Auer 's scope in varied and critical ways." Kisor v. Wilkie , --- U.S. ----, 139 S. Ct. 2400, 2418, --- L. Ed. 2d ---- (2019). The upshot of that shift is that while courts previously could have been insensitive to whether the implicit agency interpretation of a statute that they were deferring to under Chevron was actually an implicit interpretation of a rule-because even if it were, deference would be required anyway-accepting that uncertainty is no longer an option. Given that Auer and Chevron have different, non-coextensive limits, it cannot be appropriate to defer to an agency's implicit interpretation under Chevron unless it is either clear that the agency really is interpreting a statute, or, at minimum, that the agency's interpretation would be owed deference under Auer and Kisor even if the agency were interpreting a rule.[4] For that reason, the majority decides, in the alternative, that it can defer to the same materials under Auer in interpreting the applicable regulations. 365 Or. at 352, 445 P.3d at 272-73. *279 In light of Kisor , Auer now requires a five-step analysis before deference can be accorded to an agency's interpretation of its rules. "First and foremost, a court should not afford Auer deference unless the regulation is genuinely ambiguous." Kisor , --- U.S. ----, 139 S. Ct. at 2415. Before deferring to the agency, "a court must 'carefully consider[ ]' the text, structure, history, and purpose of a regulation, in **364 all the ways it would if it had no agency to fall back on." Id . at ----, 139 S. Ct. at 2415 (quoting Pauley v. BethEnergy Mines, Inc. , 501 U.S. 680, 707, 111 S. Ct. 2524, 115 L. Ed. 2d (1991) (Scalia, J., dissenting)). Second, the agency's reading "must come within the zone of ambiguity the court has identified after employing all its interpretive tools." Id . at ----, 139 S. Ct. at 2416. Third, the interpretation "must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." Id. Fourth, "the agency's interpretation must in some way implicate its substantive expertise." Id . at ----, 139 S. Ct. at 2417. Fifth, "an agency's reading of a rule must reflect 'fair and considered judgment' to receive Auer deference," Id. (quoting Christopher , 567 U.S. at 155, 132 S.Ct. 2156 ), meaning that, among other things, a court generally should not give " Auer deference to an agency construction 'conflict[ing] with a prior' one." Id . at ----, 139 S Ct at 2417-18 (quoting Thomas Jefferson University v. Shalala , 512 U.S. 504, 515, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994) ).
The first and simplest reason that no agency is owed deference in its interpretation of 33 CFR § 323.2 is that that rule is not genuinely ambiguous as to the question at hand, once ordinary interpretive methods have been applied. Neither the majority nor the state offers a permissible reading of the 2008 rule under which suction dredge mining involves the discharge of anything other than "dredged material." But even if the regulation were ambiguous, deference would not be appropriate here.
Although the majority points to recent general permits by the EPA regulating suction dredge mining under section 402, the Corps has also issued a general permit for suction dredge pursuant to section 404. That occurred in California, in 1995, with the permit expiring in 2000. See Department of the Army, Regional General Permit No. 21181-98 (Jan 7, 1995). The majority downplays that fact, suggesting that "the 1995 regional permit does not purport to be the exclusive permitting authority for suction dredge mining, but serves instead only as an auxiliary authorization" to state permits. 365 Or. at 345, 445 P.3d at 269. The same is true of the 2018 EPA Idaho permit that the majority does rely **365 upon-suction dredge miners also need approval from the Idaho Department of Water Resources-and is of no consequence for either. More substantial is the majority's suggestion that the 1995 permit may have been issued as part of the Corps' short-lived efforts to regulate in-stream excavation under the theory that the "incidental fallback" from excavation constituted a regulable "discharge of dredged material." Id. If the 1995 permit were directed only to the excavation involved in suction dredging, and not to the release of processed dredged material back into the water, then any inconsistency with the EPA's subsequent permitting of suction dredge mining would be lessened. But the majority's suggestion does not hold up to scrutiny, because the 1995 general permit plainly was not limited to "incidental fallback" from excavation. As the permit was "for certain work activities and incidental discharges of dredged or fill material associated with suction dredge mining" (emphasis added), its coverage was not limited to incidental discharges, much less to incidental fallback. And the requirements of the permit made clear that it applied to the post-processing discharge of dredged material, not (or, at least, not just) incidental fallback as a result of excavation. For example, it specified that "[m]ercury recovered from the waterway as part of the suction dredging-process may not be returned to the waterway." That requirement makes sense only if it is understood as a limitation on the release of dredged material that has been fully removed from the water and processed in some form.
Thus, in 1995, under the same statute and a functionally-identical operative regulation, the Corps concluded that suction dredge mining *280 involved a discharge of dredged material under section 404, from which it would necessarily follow that the EPA would not have permitting authority. If there is an agency interpretation in play here, it does not appear to have been a consistent one, as Kisor requires. Those inconsistent actions, the product of regional offices, also raise serious concerns that the regional permitting process may not " 'reflect[ ] the considered judgment of the agency as a whole' " as to the meaning of the regulations. Kisor , --- U.S. ----, 139 S. Ct. at 2424 (quoting Mead , 533 U.S. at 233, 121 S.Ct. 2164 ). **366 But even putting those qualms to one side, any deference would require the interpreting court first to perform its task of ensuring that "the agency's reading [falls] 'within the bounds of reasonable interpretation.' Kisor , --- U.S. ----, 139 S. Ct. at 2416 (quoting Arlington v. FCC , 569 U.S. 290, 296, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013) ). The Supreme Court has reaffirmed that Auer "gives agencies their due, while also allowing-indeed, obligating -courts to perform their reviewing and restraining functions." Id. at ----, 139 S. Ct. at 2415 (emphasis added); see also id . at ----, 139 S. Ct. at 2449 (Kavanaugh, J., concurring in the judgment) ("after today's decision, a judge should engage in appropriately rigorous scrutiny of an agency's interpretation of a regulation, and can simultaneously be appropriately deferential to an agency's reasonable policy choices within the discretion allowed by a regulation"). We cannot satisfy that obligation here because, as discussed above in the context of Chevron deference, it is impossible to tell what the supposed joint interpretation is . Certainly, the cited materials give no hint.[5] The majority points to the purpose and effects of suction dredge mining-suction dredge mining is recreational and may cloud the water-and to the EPA's expertise on the health of water bodies. 365 Or. at 350-51, 445 P.3d at 271-72. But the regulation is, on any reading, completely unambiguous that those considerations do not factor into the division of jurisdiction between the two agencies. In any event, "a court should decline to defer to a merely 'convenient litigating position' or 'post hoc rationalizatio[n] advanced' to 'defend past agency action against attack,' " Kisor , --- U.S. ----, 139 S. Ct. at 2417 (quoting Christopher , 567 U.S. at 155, 132 S.Ct. 2156 ). That being the case, this court certainly should not square the circle by deferring to its own post hoc rationalization.
It is true that, as the majority documents, there are some indications that both agencies might presently prefer discharges from suction dredge mining to be regulated by the EPA. But those signals do not qualify for deference **367 under either Chevron or Auer .[6] And the only agency product that does demand deference, the regulations promulgated by both agencies after notice and comment, points decisively in the other direction.
That leaves one final issue: whether there are, as the Court of Appeals held, two discharges from suction dredge mining-" 'dredged spoil and mining tailings' " and " 'turbid wastewater' "-or one. Eastern Oregon Mining Assoc. v. DEQ , 285 Or. App. 821, 825, 398 P.3d 449 (2017) (quoting Northwest Environmental Defense Center v. EQC , 232 Or. App. 619, 644, 223 P.3d 1071 (2009) ). To find, as the Court of Appeals did, two simultaneous discharges, one regulated by each agency, would seem to contravene the Supreme Court's interpretation of the CWA in Coeur Alaska and its holding that "a two-permit regime is contrary to the statute and regulations." 557 U.S. at 286, 129 S.Ct. 2458. In any event, even if there are two discharges, both would fall under the Corps' permitting authority. However the discharge is characterized or subdivided, it involves only the "redeposit of dredged material."
*281 Nothing that I have said should suggest that suction dredge mining might not be better regulated by DEQ in concert with the EPA, rather than by the Corps. I take no position on that policy question and heed instead the Supreme Court's caution "that 'judges ought to refrain from substituting their own interstitial lawmaking' for that of an agency." Arlington , 569 U.S. at 304-05, 133 S.Ct. 1863 (quoting Ford Motor Credit Co. v. Milhollin , 444 U.S. 555, 568, 100 S. Ct. 790, 63 L. Ed. 2d 22 (1980) ). I also do not mean to suggest that the CWA cannot permissibly be read to divide authority between the agencies as the majority does. If the Corps and the EPA were to promulgate a new rule, clarifying that suction dredge mining was not within the Corps' jurisdiction, I doubt that I would have any difficulty concluding that that also was a reasonable interpretation of section 404. The point is simply that those agencies have not done so. The last time that they spoke in a way that merited deference-when they jointly **368 promulgated the 2008 regulations-they put suction dredge mining within the Corps' purview. The Corps may now wish to disclaim permitting authority over suction dredge mining. But the current rules say what they say, and no principle of agency deference accords the emanation of an intention the same stature as a rule promulgated after notice and comment.
Accordingly, I respectfully dissent.

There are parallel and identical definitions contained in rules issued by the EPA and located in 40 CFR § 232.2. For convenience, I cite only to the Corps' rules in 33 CFR § 323.2.

The omission of any consideration of effects is particularly telling because in the context of fill material, the Corps and the EPA did opt for an effect-based definition:
"(e)(1) Except as specified in paragraph (e)(3) of this section, the term fill material means material placed in waters of the United States where the material has the effect of:
"(i) Replacing any portion of a water of the United States with dry land; or
"(ii) Changing the bottom elevation of any portion of a water of the United States."
33 CFR § 323.2.

Some courts have held that "[w]hen a statute is administered by more than one agency, a particular agency's interpretation is not entitled to Chevron deference." Proffitt v. F.D.I.C. , 200 F.3d 855, 860 (D.C. Cir. 2000). However, where, as here, both agencies charged with administering a statute have jointly promulgated a single interpretation, deference is appropriate. See Loan Syndications & Trading Association v. S.E.C. , 882 F.3d 220, 222 (D.C. Cir. 2018) (holding that Chevron does apply when the multiple involved agencies have issued a joint interpretation).

In Coeur Alaska , Justice Scalia accused the Court of invoking Auer to defer to what was effectively an agency's interpretation of a statute, in order to avoid the limitations that Mead had imposed on Chevron deference. 557 U.S. at 295, 129 S.Ct. 2458 (Scalia, J, concurring in part and concurring in the judgment). Now, Auer 's own application having been restricted, we should not use Chevron to avoid Kisor 's limitations.

The majority highlights a 1990 guidance letter that that did offer an interpretation of the relevant regulation, 365 Or. at 332-33, 445 P.3d at 261-63, but acknowledges that that letter expired almost thirty years ago and that the Corps has since indicated that that letter is no longer valid and no longer provides useful information, id . at 333 n. 15, 445 P.3d at 262. It is not, therefore, an interpretation that might merit deference.

Other agency actions may still qualify for deference under Skidmore v. Swift & Co. , 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944), to the extent that they have the power to persuade. But, because the general permits that the majority relies on do not advance an interpretation or a justification, Skidmore deference also is unavailable.